[No. G021049. Fourth Dist., Div. Three. Sept. 29, 2000.]

GARRETH E. SHAW, Plaintiff and Respondent, v.
HUGHES AIRCRAFT COMPANY, Defendant and Appellant.

**COUNSEL**

Quinn, Emanuel, Urquhart & Oliver, Eric J. Emanuel, Steven G. Madison, William O. Stein; Greines, Martin, Stein & Richland, Kent L. Richland, Feris M. Greenberger, Sheila S. Kato and Barry M. Wolf for Defendant and Appellant.

Law Offices of John W. Cochrane, John W. Cochrane; Law Offices of Michelle A. Reinglass and Michelle A. Reinglass for Plaintiff and Respondent.

**OPINION**

**BEDSWORTH, J.**—Hughes Aircraft Company (Hughes or Hughes Aircraft) appeals from a jury verdict for Garreth E. Shaw in this wrongful

termination action, challenging the legal sufficiency of each cause of action upon which Shaw recovered.

Shaw moves to dismiss the appeal, arguing the notice of appeal filed by Hughes's parent company, Hughes Electronics Corporation (Hughes Electronics), was ineffective because it was not a party to the action.[1] Hughes Electronics in turn moves to be substituted as the proper party appellant. We deny the motion to dismiss and grant the motion to substitute. On the merits, we reverse and remand for a new trial on three of the causes of action.

Shaw, a government contracts lawyer, left a high-level position with the federal government in 1990 to join Hughes's in-house legal staff.[2] He was assigned to the Hughes Industrial Electronics Group, where his immediate supervisor was Senior Staff Counsel Paul Bogenrief, through whom he was ultimately responsible to General Counsel John Higgins. Shaw provided legal advice to various Hughes divisions. His office was located at the Microelectronics Division in Newport Beach, managed by Donald Shrock.

Prior to the summer of 1993, Shaw had conflicts with both management and the legal department. The Newport Beach facility was under government scrutiny for alleged improprieties, and several times Shaw locked horns with Shrock over the manager's handling of the problems. Once this resulted in Shrock being rebuked for ignoring the advice of the legal department. Another time Shaw blocked Shrock's attempt to lay off an individual involved in some of the problems. On a third occasion, Shaw went over Shrock's head to compel the manager to cooperate in preparing a study Shaw needed in connection with litigation against Hughes. Shaw also lodged complaints against the human resources department, alleging that employee time cards were falsified and retirement benefits were awarded on a discriminatory basis.

In his work for another division, Shaw alerted an associate general counsel that test data was being falsified, and an investigation resulted. The division manager, in Shaw's version, interfered with the inquiry, with the result that Shaw was eventually removed from the investigation.

Shaw also had run-ins with General Counsel Higgins. According to Shaw, Higgins had a " 'mercurial' management style which he periodically unleashed on Mr. Shaw . . . ." Their relationship was likely not aided by

---

[1] We will refer to the corporate party defendant as Hughes except in those situations where clarity requires us to distinguish between Hughes Aircraft and Hughes Electronics.

[2] We consider the evidence most favorable to Shaw, since we must indulge all reasonable inferences and resolve all doubt in favor of upholding the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) However, our recitation of the facts is brief since Hughes argues legal, not factual, error. Shaw tries to shift the focus by contending there was ample evidence to support the judgment, much of which he recites in his brief. But that is not in issue.

negative comments Shaw made about Higgins at a legal department meeting to discuss morale, which led some colleagues to caution Shaw about his outspokenness.

In August 1993, Bogenrief told Shaw he had been accused of sexual harassment by several women and was being suspended pending an investigation. An outside attorney, Catherine Hagan of O'Melveny & Myers, was retained for this purpose. Shaw claimed he was being retaliated against for his role in the various investigations, the ethics complaints he filed, and his criticism of Higgins. Hagan interviewed the women and Shaw. She prepared a report and advised Higgins there was clear evidence of sexual harassment. She reported that the claims were credible, Shaw admitted many of the incidents but claimed they were taken out of context, and there was no evidence of retaliation. Higgins concluded he had good cause to terminate Shaw's employment and did so in September 1993. This action followed.

Shaw sued Hughes for breach of contract, breach of the implied covenant of good faith and fair dealing, wrongful discharge in violation of public policy, and spoliation of evidence. A defamation count named Bogenrief along with Hughes,[3] and one for intentional infliction of emotional distress was against Higgins, Bogenrief, and Shrock as well as Hughes. Shaw recovered $605,083,[4] to which the trial judge added $100,000 as attorney fees on the spoliation count under a private attorney general theory and $42,071 in costs and prejudgment interest, for a total of $747,154.

I

Hughes Electronics first surfaced at the pretrial motion stage, when a defense motion for summary adjudication stated counsel was appearing for "Defendant Hughes Electronics Corporation," and a footnote declared "the correct name at the present time is Hughes Electronics Corporation." After that, all documents filed by defense counsel stated they were appearing on behalf of "Defendant Hughes Electronics." This included the motions for

---

[3]Higgins was also named a defendant on the defamation cause of action, but won a nonsuit at the close of Shaw's case.

[4]A separate verdict was rendered on each cause of action as to each defendant. The jury arrived at a defense verdict on the breach of contract claim, but awarded Shaw $405,153 for breach of the implied covenant of good faith. It found Shaw was wrongfully discharged but declined to award any damages. The jury awarded $20,000 for intentional spoliation of evidence and $10,000 for negligent spoliation, and $60,000 in punitive damages on the intentional spoliation claim. Shaw recovered $100,000 against Hughes for defamation, but at the same time the jury came in with a defense verdict for Bogenrief on the same cause of action. On the emotional distress claim, there was a defense verdict. This adds up to $595,153, yet judgment was entered for $605,083. The discrepancy is not explained by the parties.

judgment notwithstanding the verdict and for a new trial, as well as a motion to tax costs and opposition to Shaw's motion for attorney fees. To some extent, Shaw acceded to this designation in addressing his own motions to "Hughes Aircraft/Hughes Electronics" or the like, and even gave notice of a cross-appeal to both entities.

█ Shaw argues the appeal must be dismissed because Hughes Aircraft never filed a notice of appeal and Hughes Electronics, not a party to the action, has no standing to appeal. But a nonparty may obtain the right to appeal under certain circumstances, which we conclude exist here.

"Any party aggrieved" may appeal from an adverse judgment. (Code Civ. Proc., § 902.) The test is twofold—one must be both a party of record to the action *and* aggrieved to have standing to appeal. The first requirement, that one be a party of record, is subject to an exception under which a nonparty who moves to vacate the judgment is permitted to appeal as if he were a party. We think the exception should equally encompass a nonparty who moves for judgment notwithstanding the verdict and a new trial, as we shall explain.

The leading case is *County of Alameda v. Carleson* (1971) 5 Cal.3d 730 [97 Cal.Rptr. 385, 488 P.2d 953]. There, several counties sued a state agency for a declaration that certain regulations pertaining to eligibility for welfare benefits were invalid. The relief sought would have terminated grants to some welfare recipients. Three individual recipients and the California Welfare Rights Organization (collectively CWRO) sought to intervene, but the motion was denied. After judgment was entered declaring the regulations invalid, CWRO moved to vacate the judgment, again unsuccessfully. It appealed both the denial of the motion to intervene and the judgment. (*Id.* at pp. 734-735.)

The court explained that "one who is legally 'aggrieved' by a judgment may become a party of record and obtain a right to appeal by moving to vacate the judgment pursuant to Code of Civil Procedure section 663." (*County of Alameda v. Carleson, supra,* 5 Cal.3d at p. 736.) One is aggrieved when the judgment has an immediate, pecuniary, and substantial effect on his interests or rights. (*Id.* at p. 737.) The court held that CWRO's motion to vacate made it a party entitled to appeal, and it was legally aggrieved because the judgment, in terminating its members' benefits, had an immediate, pecuniary, and substantial effect upon their rights. (*Id.* at pp. 736-737.)

Hughes Electronics falls within this exception and has standing to appeal. The first requirement, party status, should be available to a nonparty who

moves for judgment notwithstanding the verdict (Code Civ. Proc., § 629) and for a new trial (Code Civ. Proc., § 657) on the same basis as one who moves to vacate the judgment (Code Civ. Proc., § 663). The former motions, like the latter, ask the trial judge to vacate a verdict or judgment and enter a new one. (See *Lippman v. City of Los Angeles* (1991) 234 Cal.App.3d 1630, 1634 [286 Cal.Rptr. 406].)[5]

There would seem to be no question that Hughes Electronics satisfied the second requirement, that it be aggrieved by the judgment. It assumed the obligation to pay it. A declaration submitted in opposition to the motion to dismiss by Janet L. Williamson, corporate secretary of Hughes Electronics since late 1997, and assistant secretary of Hughes Aircraft from 1989 to 1997, states that Hughes Electronics took responsibility for defending the action prior to trial and "the present Hughes Electronics Corporation . . . is responsible for paying any judgment against Hughes Aircraft Company in the Shaw action." The obligation to pay nearly $750,000 is immediate, involves a pecuniary loss, and is undoubtedly substantial.

Shaw objects that the declaration lacks foundation and is hearsay, because Williamson does not substantiate the various corporate transactions that led to Hughes Electronics' assumption of liability for the judgment. But Shaw does not eschew the right to collect from Hughes Electronics. Quite the contrary, he concedes the order of substitution "merely clarifies that [Shaw] may now seek payment of the judgment . . . from Hughes Electronics . . . ." Since both sides agree Hughes Electronics is liable on the judgment, there is no doubt it is aggrieved for purposes of standing to appeal.

## II

█ Hughes Electronics argues substitution in this court is automatically required since it obtained the order of substitution from the superior court.

---

[5]Shaw argues a motion for judgment notwithstanding the verdict should not give a nonparty the right to appeal because Code of Civil Procedure section 629 restricts such motions to a "party against whom a verdict has been rendered." That is too narrow a reading of the code section, and Shaw fails to suggest any policy that would be furthered by such an interpretation.

Code of Civil Procedure section 629 provides that the trial court "either of its own motion . . . or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of *the aggrieved party* notwithstanding the verdict" whenever a motion for a directed verdict for the aggrieved party should have been granted had one been made. (Italics added.) Read literally, the statute seems to say the motion must be made by the losing party but allows the judge to enter a new judgment in favor of someone else, provided he be "the aggrieved party," a term defined by the Supreme Court in *County of Alameda v. Carleson, supra,* 5 Cal.3d 730. If there is an anomaly here, it can be resolved by reading the statute broadly, to allow the aggrieved party to both make the motion and benefit from a new judgment. In any event, Hughes Electronics's motion for a new trial is sufficient to give it standing to appeal, quite apart from the motion for judgment notwithstanding the verdict.

(Cal. Rules of Court, rule 48(a).) It is wrong. The trial court lost jurisdiction over matters embraced in the judgment when the appeal was perfected. (Code Civ. Proc., § 916, subd. (a); *Betz v. Pankow* (1993) 16 Cal.App.4th 931, 938 [20 Cal.Rptr.2d 841].) The belated substitution in the trial court, in September 1999, cannot confer standing if none existed when Hughes Electronics filed the notice of appeal in January 1997. (Cf. *Shiver, McGrane & Martin v. Littell* (1990) 217 Cal.App.3d 1041, 1047 [266 Cal.Rptr. 298]; *Hollaway v. Scripps Memorial Hospital* (1980) 111 Cal.App.3d 719, 724, fn. 1 [168 Cal.Rptr. 782] [Cal. Rules of Court, rule 48(a) "was never intended to authorize . . . an order . . . in conflict with the jurisdiction of the Court of Appeal."].)

However, since we conclude Hughes Electronics obtained the right to appeal by its posttrial motions, no harm is done in allowing the substitution. For this reason, and this reason only, the motion is granted.

## III

■ Hughes argues the award for breach of the implied covenant of good faith must be set aside since the jury found no breach of contract. Shaw counters that it should be sustained as damages for wrongful discharge in violation of public policy, reasoning that the same conduct led the jury to find both wrongful discharge and bad faith. Both sides are mistaken. We conclude that the contract and implied covenant determinations are inconsistent, and there was a compromise verdict on the wrongful termination claim, so all must be set aside and a new trial ordered on these claims.

## A

Inconsistent verdicts are " 'against the law,' " and the proper remedy is a new trial. (*Morris v. McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 970 [132 Cal.Rptr. 37].) The jury's finding that there was no breach of contract is irreconcilable with its finding that Hughes did breach the implied covenant of good faith, so both claims must be retried.

Shaw's contract, bad faith and wrongful termination claims all turned on the same allegation—that Hughes fired him without good cause. The employee's theory was that the company used the sexual harassment charge as a pretext to get rid of a whistleblower. In closing argument, counsel emphasized that "Mr. Shaw has an expectation of termination only for good cause" and there were "three different ways in which the breach or termination of Mr. Shaw's employment relationship is actionable . . . . [¶] First, a

straightforward breach of contract. . . . [S]econd . . . the breach of the covenant of good faith and fair dealing. . . . And the third issue is wrongful termination in violation of public policy."

On the contract claim, the jury was instructed that Shaw had to prove his contract permitted discharge only for cause, and that Hughes did not have good cause to dismiss him. On the implied covenant claim, the jury was told that Shaw had to establish a contract, performance, conduct by Hughes that was "separate and apart from the performance of obligations under the contract, without good faith and for the purpose of depriving [Shaw], as employee, of rights and benefits under the contract," and lastly, injury.

During the second of four days of deliberations, the jury asked " 'if we determine that Hughes did not indeed breach its contract (claim #1) with Gary Shaw, any further decisions on our part are unnecessary?' " The trial judge responded that even if the jury reached a decision on the first cause of action, they had to continue and any decision on that claim did not automatically tell them how to decide the remaining issues. Ultimately, the jury found no breach of contract (9-3), but also found a breach of the implied covenant (12-0).

The jury's finding that there was no breach of contract implies it believed Shaw was an at-will employee. The other possibility, that Hughes had cause to dismiss Shaw, is refuted by the wrongful termination verdict; the determination that Shaw was fired as a whistleblower, and not for sexual harassment, necessarily means the jury felt that Hughes did not have good cause to rid itself of Shaw. Yet the finding that Hughes acted in bad faith implies the jury believed Shaw could only be dismissed for cause. The upshot is findings that are irreconcilable: that Shaw was an at-will employee and that he was not.

Hughes admits the verdicts are inconsistent, but insists the no-contract finding trumps the bad faith award. Its position seems to be that the contract verdict was rendered first, so it controls over the later bad faith award. But that is not what happened, and it does not ameliorate the inconsistent findings.[6]

Shaw's argument is equally unpersuasive. He contends the wrongful termination verdict means the jury must have found he was fired without

---

[6]In supplemental briefs we requested on the issue of a compromise verdict (discussed *post*, in Pt. III.B), Hughes went beyond our specific direction that the parties address *only* this issue, and argued for the first time that the implied covenant instruction was impermissibly broad. It contended this error allowed the jury to find Hughes acted in bad faith when it dismissed Shaw as a whistleblower, even if it found he was an at-will employee. We decline to consider the argument under the rule that an appellant's failure to raise an issue in its

cause (we agree), which in turn is enough to sustain the bad faith award. But this ignores the conflict between the two findings. Shaw is no more entitled than Hughes to have the favorable verdict credited and the unfavorable one disregarded.

Nor can we sustain the award as damages for wrongful discharge, as Shaw suggests. First, wrongful discharge is a tort, and "tort remedies are not available for breach of the implied covenant in an employment contract to employees who allege they have been discharged in violation of the covenant." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 700 [254 Cal.Rptr. 211, 765 P.2d 373], fn. omitted.) Second, as we shall discuss presently, the wrongful discharge determination was a compromise verdict that cannot stand.

## B

When the issue of liability is sharply contested, and the jury awards inadequate damages, the only reasonable conclusion is the jury compromised the issue of liability, and a new trial is required. (*Rose v. Melody Lane* (1952) 39 Cal.2d 481, 488-489 [247 P.2d 335].) A divided verdict provides further indicia there was a compromise. (*Wilson v. R. D. Werner Co.* (1980) 108 Cal.App.3d 878, 884 [166 Cal.Rptr. 797].)

Here, the parties disagreed strongly over whether Hughes dismissed Shaw because of sexual harassment or to remove a thorn in its side. The jury bought Shaw's version, but only by a nine-to-three vote, and then awarded him no damages. Not surprisingly, the parties differed wildly on Shaw's damages, but the jury did not even award the $200,000 that Hughes's economist calculated as Shaw's minimum loss.

As the court concluded in *Wilson v. R. D. Werner Co., supra,* 108 Cal.App.3d at page 884: "The conflicting evidence of liability, the clear inadequacy of the damages awarded, and the additional fact that the jury returned a nine-to-three verdict [citation], all indicate that the jury verdict was probably the result of a compromise on the liability issue, requiring a new trial on all issues. [Citation.]"

---

opening brief waives it on appeal. (*Tisher v. California Horse Racing Bd.* (1991) 231 Cal.App.3d 349, 361 [282 Cal.Rptr. 330].)

## IV

■ Hughes attacks the defamation award on the ground that it cannot be liable for defamation when the jury rendered a defense verdict for Bogenrief,[7] the only individual charged with uttering the statements in question. Shaw did not appeal from the Bogenrief verdict, so Hughes stands liable for defamation committed by no individual. This is not possible, so the defamation award must be reversed.

A judgment on the merits in favor of an employee bars recovery against the employer when the only claim against it is based on vicarious liability and there is no allegation the employer committed an independent tort. (*Freeman v. Churchill* (1947) 30 Cal.2d 453, 461 [183 P.2d 4].) Such is this case.

A corporation can only act through individuals (see *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 77 [53 Cal.Rptr.2d 741]), so it can only be liable for defamation derivatively. Hughes could only defame Shaw by acting through its employees or agents. Yet Shaw fails to point to any evidence of such conduct by another Hughes employee, absent which the company cannot be liable.

Shaw argues the jury found Hughes was independently liable because it was a joint participant in the defamatory conduct, and the award is justified because Hughes "orchestrated the conduct at issue." Neither point is persuasive. Hughes could not participate in anything, or orchestrate anything, but through the conduct of an employee, and none was found to have made defamatory statements. Shaw is equally mistaken when he asserts that *Jensen v. Southern Pacific Co.* (1954) 129 Cal.App.2d 67 [276 P.2d 703], and *Roberts v. Ford Aerospace & Communications Corp.* (1990) 224 Cal.App.3d 793 [274 Cal.Rptr. 139], stand for the proposition that a corporation can be held liable for the conduct of an employee who was exonerated. In both cases, the employer was alleged to have independently engaged in tortuous conduct. The defamation award cannot stand.

---

[7]Hughes is mistaken when it claims the jury rendered a special verdict and returned a "special finding exonerating Bogenrief." There was neither. When a jury is asked to pronounce generally in favor of the plaintiff or defendant on all or any of the issues, they render a general verdict. By contrast, a special verdict is one where the jury finds the facts, and leaves the judgment to the court. (Code Civ. Proc., § 624.) Although Hughes proffered a special verdict form, the trial judge rejected it. The verdict forms submitted to the jury asked them to find for plaintiff or defendant on each cause of action—unmistakably a series of general verdicts. (*Chavez v. Keat* (1995) 34 Cal.App.4th 1406, 1409, fn. 1 [41 Cal.Rptr.2d 72].)

V

■ Nor can we find support for the spoliation causes of action. Hughes argues the spoliation award, compensatory and punitive, must be reversed in light of *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1 [74 Cal.Rptr.2d 248, 954 P.2d 511] (*Cedars-Sinai*), which held that a party to an action has no tort claim for spoliation if he knew or should have known of the spoliation before trial or other decision on the merits. (*Id.* at pp. 17-18.) Shaw counters that *Cedars-Sinai* should not be applied retroactively because it was announced after judgment was entered in this case, the contrary rule was long relied upon, and the Supreme Court's concerns of judicial economy in abolishing spoliation are not implicated here.[8]

While we understand Shaw's disappointment, we can find no reason to depart from the usual rule that new decisions apply retroactively to all pending cases not yet final. The spoliation verdicts cannot stand, and with them must fall the award of attorney fees on the spoliation claims.

■ Judicial decisions are generally applied retroactively, and accordingly, *Cedars-Sinai* has been given full retroactive effect. (*Hassoldt v. Patrick Media Group, Inc.* (2000) 84 Cal.App.4th 153, 159.) There is an exception to the general rule for situations where retroactive application would be unfair because of reasonable reliance on the old rule, provided prospective application would not undermine the new one. Where reliance is claimed because litigation was commenced based on the old rule, the availability of alternate theories or remedies cuts against the exception. By contrast, the most compelling case for the exception is where the new rule completely denies a party his day in court, or deprives him of any remedy whatsoever. (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 988-990 [258 Cal.Rptr. 592, 772 P.2d 1059].) We are not persuaded that this case falls within the exception.

■ Here Shaw's reliance argument is weak because he made use of the alternative remedies for destruction of evidence, and the purposes behind *Cedars-Sinai* would be undercut if we declined to apply the decision retroactively. Shaw sought discovery sanctions, albeit unsuccessfully, when he learned that Hughes had failed to preserve certain evidence. He also took full advantage of the missing evidence; the trial judge instructed the jury that if

---

[8]Shaw does not suggest negligent spoliation should be treated any differently than intentional spoliation under *Cedars-Sinai*. Nor do we see any basis upon which to draw such a distinction, in light of recent decisions holding there is no cause of action for negligent spoliation. (*Farmers Ins. Exchange v. Superior Court* (2000) 79 Cal.App.4th 1400 [95 Cal.Rptr.2d 51]; *Coprich v. Superior Court* (2000) 80 Cal.App.4th 1081 [95 Cal.Rptr.2d 884].)

they found evidence was willfully suppressed, they could consider that fact in determining what inferences to draw from the evidence that was presented.

The Supreme Court pointed to three reasons for abolishing the tort of spoliation: It wanted to avoid the proliferation of derivative tort remedies for litigation-related misconduct; it was concerned about the uncertainty of harm in spoliation cases; and the court believed existing non-tort remedies were sufficient. (*Cedars-Sinai, supra,* 18 Cal.4th at p. 8.) Among the remedies it specifically identified as satisfactory were those utilized by Shaw—discovery sanctions and the evidentiary inference to be drawn from destruction of evidence. (*Id.* at pp. 11-12.) Since Shaw protected his interests in precisely the manner the Supreme Court found adequate, we are unwilling to undercut the court's concerns over too much litigation and uncertain harm by limiting *Cedars-Sinai* to prospective application in this case.

Shaw cites *Woods v. Young* (1991) 53 Cal.3d 315 [279 Cal.Rptr. 613, 807 P.2d 455] as a case where the court declined to apply its decision retroactively, but *Woods* is distinguishable. It involved the interpretation of a statute of limitations. The court was concerned that retroactive application of a procedural rule would bar plaintiff's action regardless of the merits and that pending cases timely filed would be barred, yet it recognized that its efforts to harmonize conflicting lower court decisions would not be compromised by prospective application. (*Id.* at pp. 330-331.) In *Woods,* all of the factors pointed toward prospective application, but here the important ones point the other way.

The judgment in favor of Shaw on the causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful termination in violation of public policy is reversed and the matter remanded for retrial on those causes of action only. The judgment for Shaw on the causes of action for defamation, intentional and negligent spoliation of evidence, the award of punitive damages for spoliation of evidence, and the award of attorney fees is reversed, and the trial court is directed to enter an order dismissing the defamation and spoliation causes of action. Each side shall bear its own costs on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.

On October 19, 2000, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 10, 2001.