Filed 7/17/14  Martinez v. Orozco CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAMES MARTINEZ et al., | |
| Plaintiffs  and Respondents, | G047381 |
| v. | (Super. Ct. No. 30-2010-00333764) |
| OSVALDO OROZCO, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Appellant; | [NO CHANGE IN JUDGMENT] |
| DEPARTMENT OF TRANSPORATION, | |
| Defendant and Respondent. | |

The opinion filed in this case on June 17, 2014, is ordered modified as follows:

1. On page 16, the following is added after the last sentence of the first full paragraph:

We therefore remand the matter for further proceedings not inconsistent with this opinion.

This modification does not change the judgment.  The petition for rehearing is DENIED.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAMES MARTINEZ et al.,<br><br>    Plaintiffs  and Respondents,<br><br>        v.<br><br>OSVALDO OROZCO,<br><br>    Defendant and Appellant;<br><br>DEPARTMENT OF TRANSPORATION,<br><br>    Defendant and Respondent. | G047381<br><br>(Super. Ct. No. 30-2010-00333764)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, B. Tam Nomoto Schumann, Judge.  Affirmed in part, reversed in part and remanded.

Veatch Carlson, Bruce Schecter, Steven C. Robinson, Peter H. Crossin; Greines, Martin, Stein & Richland, Robert A. Olson and Jeffrey E. Raskin for Defendant and Appellant.

Ronald W. Beals, Chief Counsel, Jeffrey R. Benowitz, Deputy Chief Counsel, Glenn B. Mueller, John Frederick Smith, Assistants Chief Counsel and Heidi A. Wierman, Deputy Attorney for Defendant and Respondent.

No appearances for Plaintiffs and Respondents.

\*　　　\*　　　\*

Defendant Osvaldo Orozco drove southbound on State Route 57 freeway (SR 57) with three passengers in his 1972 Chevrolet Nova. He had been drinking and lost control of the car. It went off the freeway, down an embankment, and stopped only after hitting two trees and catching fire. Orozco and his front passenger were apparently thrown from the car and injured, but the two rear seat passengers died. The surviving passenger and the estates of the two decedents sued Orozco for negligence and the California Department of Transportation (Department) for maintaining a dangerous condition. Orozco cross-complained against the Department. The jury found Orozco liable. In its special verdict, the jury found the state's property was in a dangerous condition, but the "kind of injury" suffered was not reasonably foreseeable. Orozco appealed and contends the jury verdicts in connection with the issue of the Department's liability are inconsistent and require a new trial. The Department argues the verdicts are not inconsistent and, if they are, Orozco forfeited his claim by not raising the issue in the trial court. We find Orozco did not forfeit the issue and the verdicts are inconsistent. We remand the matter for a new trial against the Department only.

2

I

FACTS

A. *The Lawsuits*

Luis Mendez and the parents of Jesus Colin filed suit against Orozco and the Department, alleging Colin and Mendez were passengers in a vehicle driven by Orozco on SR 57 on January 11, 2009. The complaint alleged Orozco lost control of the automobile, drove across all traffic lanes, left the highway, and went down an embankment where it hit two eucalyptus trees and burst into flames. It further alleged Mendez was found 500 feet away from the car and Colin was found dead inside the vehicle. The complaint also alleged the Department created a dangerous condition at the location of the accident by having an unprotected, steep dirt embankment immediately adjacent to SR 57, and placing eucalyptus trees on the slope. Additionally, it was alleged a guardrail or other protective device should have been in place where Orozco's vehicle left the highway.

Andrew Martinez's parents also filed suit against Orozco and the Department, alleging Martinez died in the crash. Orozco subsequently filed a cross-complaint against the Department for apportionment of fault, indemnification, and declaratory relief. All matters were consolidated for trial.

B. *The Evidence at Trial*

1. *The Accident*

About 4:00 a.m. on January 11, 2009, Orozco drove his 1972 Chevrolet Nova southbound on SR 57. Luis Mendez was the right front passenger. Andrew Martinez and Jesus Colin were the backseat passengers. The car had no seat belts. The group had been celebrating a birthday. According to Orozco, he had three or four beers earlier that night, but stopped drinking by midnight.

3

Esther Carroll, who was driving southbound in the number two lane of SR 57, saw an old Chevrolet Nova in her rear mirror.  It passed her on her left in the number one lane, immediately adjacent to the carpool lane, at a normal speed for the circumstances.  A couple of seconds after the Nova passed Carroll, "it just disappeared."  The next thing Carroll remembered seeing was a "fiery mushroom" from the explosion.  Carroll said there were no other cars heading southbound at that time.  She pulled over to the side of the road and called 911.

Orozco stipulated he had been negligent.  He said he was not sure what caused him to lose control.  He remembered a vehicle close to the driver's side of the Nova and he felt something on the back of his head, as if he had been hit in the head.  In a letter apparently written to the judge who was to sentence him on the criminal charges arising out of the incident, Orozco claimed the rear passengers had been playing with a Club, a steering wheel locking device, apparently implying he was hit in the head by the Club.

Although Orozco does not remember going off the freeway or down the embankment, he remembers waking up to a burning sensation on his face and right forearm.  He found Mendez on the ground.  Mendez's jacket was charred and hot to the touch.  Still, Orozco tried to pull Mendez away from the burning car.

Mendez, who had been drinking too, said he "must have fallen asleep" before he felt the car go out of control.  He regained consciousness on the ground when revived by Orozco.  He remembered feeling heat, smelling smoke, and feeling pain all over.  Orozco helped him to his feet, but Mendez had trouble walking and fell.  The next thing he remembered was waking up in a hospital emergency room.  The highway patrol officer who responded to the scene said Mendez clearly had a broken arm.

According to one accident reconstructionist, the Nova was travelling between 72 and 74 miles an hour at the time of the incident.  Another estimated the Nova hit the curb/asphalt dike at the end of the road's shoulder at roughly 75 to 80 miles an

4

hour.  Based on Orozco's speed and the results of his alcohol tests, it was opined Orozco had not been driving in a safe manner.

The Nova went off the road at almost a 90-degree angle, crossed the 10-foot shoulder to the highway, hit the assault curb/dike, went over the embankment next to the shoulder, and down the steep slope, stopping only after it hit two eucalyptus trees Caltrans had planted on the slope, and burst into flames.  An expert testified the contact with the second tree ruptured the fuel tank and the vehicle caught fire when leaked gasoline was ignited by an electrical spark, or after the leaked gasoline came in contact with a hot surface on the car.  Once firefighters put out the fire, a highway patrol officer saw the two deceased passengers, Martinez and Colin, in the front left portion of the passenger compartment "kind of piled on top of each other" and fully burned.

2. *The Roadway*

SR 57 opened for traffic in 1970.  It has five southbound lanes (including a carpool lane), a 10-foot shoulder, a three-foot-flat dirt area adjacent to the shoulder, and a steep downhill slope after the flat dirt area.  In the 10 years prior to the present incident, there were six other accidents in which cars ran off the road in the same area.  Two vehicles went down the embankment and struck trees.

3. *The Slope*

There was evidence produced that the slope next to SR 57 where the incident occurred, is "too severe."  It is a 13 to 15 foot "rather steep down slope."  It has a two-to-one ratio, meaning it drops off one foot in elevation for every two feet horizontal. A two-to-one slope is considered not only nonrecoverable— a vehicle on the slope cannot be controlled— but also nontraversable, meaning a car is likely to roll over on the slope if it "get[s] sideways a little bit."  In 2006, the Department's Traffic and Design Manual found two-to-one slopes to be too severe and modified the standards to require slopes no greater than four-to-one (one-half the steepness of the slope in this matter).  If

5

the slope on SR 57 were to be built today, it would be engineered to a four-to-one or six-to-one ratio due to safety issues.

The embankment contained 15-inch wide eucalyptus trees 12 feet down the slope. The trees were added between 1997 and 2001. An automobile hitting a six-inch wide tree will usually break the tree, but 15-inch wide trees do not break. Instead, a vehicle colliding with such a tree will sustain indentations, which on occasion will result in fire due to the suddenness of the impact or the fracturing of the gas tank. As of 2002, large trees on such a steep slope were no longer standard. The addition of trees to a too severe slope exacerbates the safety problem, given cars suffer massive structural damage when they strike a large tree. According to a traffic engineer, it was foreseeable for a car to go off the highway and down the slope.

In March 1999, there was an accident in the same area. A vehicle swerved to miss a tire tread in the road. The driver lost control and the vehicle went off the shoulder, struck the asphalt dike, and overturned on the shoulder. In December of that year there was another accident in the same area. A vehicle was travelling southbound at about 90 to 100 miles per hour, swerving in and out of traffic, cutting off another vehicle. The driver of the second vehicle lost control, went off the roadway, and over the embankment. It overturned and hit a tree near the eucalyptus trees involved in the present incident. In May 2000, a car went over the embankment and hit a fence.

In July 2002, a car in the southbound number four lane swerved, lost control, and went over the embankment, hitting a tree. Another accident in the same area occurred in February 2004. On that occasion, a vehicle in the number one lane cut off a vehicle in the number two lane, causing that latter driver to lose control and leave the roadway, stopping only when the vehicle hit a fence and a tree. In July 2004, the driver of a vehicle in the number one lane claimed to have been cut off, lost control of the vehicle, went off the road, hit the dike at the end of the roadway and went over the embankment into a shrub/tree.

6

In December 2005, a vehicle in the number four lane was side-swiped. The driver lost control, hit the dike at the end of the shoulder, and overturned on the embankment.

### 4. *Guardrail Installation*

A traffic engineer testified there should have been a guardrail in place at the scene of the accident. If a guardrail had been installed, the Nova would not have gone over the embankment. It would have struck the guardrail and bounced back into the traffic lanes. The expert said he would not have expected fatalities had a guardrail been in place. Neither would the fuel tank have ruptured.

The Department has criteria to determine whether a guardrail should be installed at a given location. The equal severity curve is a chart used to determine whether an accident would be less, equal, or more severe if a guardrail were in place at a given location. The degree of the slope is listed on the vertical (*y*) axis and the height of the embankment is listed on the horizontal (*x*) axis. According to the equal severity curve, an accident in which a vehicle leaves the roadway and goes off an embankment of slightly more than 10 feet with a two-to-one slope would be more severe than if the vehicle had hit a guardrail instead.

There was evidence the equal severity curve was met in this case. The Department's expert testified the Department is not required to install a guardrail at every location where the equal severity curve is met. The reason is financial: A study in the 1970's showed it would cost $300 million to install guardrails in every location in California where the equal severity curve has been met. Consequently, guardrails are economically feasible only when installed "at potentially high frequency ran-off-road accident location; i.e., on the outside of horizontal curves on higher volume roadways."

The Department's expert testified that in the 10 years preceding this incident, 442 million vehicles passed by the scene and there were five accidents in which vehicles went over embankments in the area and only two occurred where the equal

7

severity curve had been met. As a result, he opined one accident for every 88 million vehicles does not establish a high probability of a vehicle leaving the highway at that location. He concluded such a probability weighs against installing a guardrail even if the equal severity curve was met.

C. *The Verdicts and Posttrial Proceedings*

The court provided the jury with special verdict forms. The jury found Orozco's negligence was a substantial factor in causing Mendez's injuries and the deaths of Colin and Martinez. It further found state property was in a dangerous condition at the time of the incident, but the dangerous condition did not "create a reasonably foreseeable risk" that the kind of injury suffered by Mendez, Colin, or Martinez would occur. The jury awarded the parents of Colin and Martinez, respectively, $35,000 in economic loss and $1,000,000 in noneconomic loss, and awarded Mendez $179,000 in economic and noneconomic loss.

The Colins family filed a motion for judgment notwithstanding the verdict in favor of the Department, or a new trial. The Martinezes also sought a new trial. Orozco joined in the motions for new trial. The court denied the motions. Martinez and Orozco appealed from the judgment. We consolidated the appeals. We subsequently granted Martinezes' motion to dismiss their appeal. None of the plaintiffs filed a respondent's brief in the present matter.

II

DISCUSSION

A. *Forfeiture*

Orozco claims the verdicts are inconsistent and require reversal. The Department argues Orozco forfeited this claim, either because the inconsistency was apparent based on the special verdict forms submitted to the jury or because he failed to object to the inconsistency before the jury was excused. On the issue of forfeiture, the

8

Department relies on *Greenwich S.F. LLC v. Wong* (2004) 190 Cal.App.4th 739. *Greenwich* is inapposite. There, the court held a buyer waived her claim against an escrow company for return of her deposit by agreeing to an escrow cancellation instruction releasing the escrow company from "'any and all liability in connection with this escrow.'" (*Id.* at p. 767.) *Greenwich* did not consider the issue of inconsistent verdicts.

The Department argues the appellants in each case cited by Orozco had "presevered [their] appellate rights either during the trial or through . . . posttrial motions." (See *Kurtin v. Elieff* (2013) 215 Cal.App.4th 455, 463 [issue raised in new trial motion]; *Singh v. Southland Stone U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 350-351 [same]; *Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 707 [request in trial court for judgment to be entered in its favor]; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 676 [issue of inconsistent verdicts raised in motion for new trial]; *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344;[1] *Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 299 [issue was whether trial court erred in instructing the jury it had returned inconsistent verdicts].) The question of whether the appellants in those cases forfeited the right to complain of inconsistent verdicts was not at issue, and "'it is axiomatic that cases are not authority for propositions not considered.' [Citation.]" (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1160.) More troubling is the Department's failure to respond to Orozco's citation to *Zagami Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083 (*Zagami*) on

---

[1] In *Shaw v. Hughes Aircraft Co.*, *supra*, 83 Cal.App.4th 1336, neither side sought reversal on the ground of inconsistent verdicts. Rather, Hughes argued the verdict against it for breach of the implied covenant of good faith should be set aside because the jury found no breach of contract. Shaw on the other hand argued the award should be sustained as damages on another cause of action, wrongful discharge in violation of public policy. The court found both were wrong and the issue was one of inconsistent verdicts, which are "'against the law'" in California. (*Id.* at p. 1344.)

9

this issue, especially in light of the Department's citation to *Zagami* for another proposition.

The Department's forfeiture argument is in direct contradiction to the decision in *Zagami*. There, the plaintiff rented a skiploader tractor to the defendant. The skiploader subsequently disappeared from the jobsite. The jury awarded the plaintiff $15,500 on a breach of contract cause of action, but valued the skiploader at $30,000 for purposes of the open book account cause of action. On appeal, the defendant claimed the judgment should have been for no more than $15,500 and the plaintiff argued it was entitled to judgment for $30,000. (*Zamagi*, *supra*, 160 Cal.App.4th at pp. 1086-1087.) The appellate court found the jury's special verdicts were "hopelessly ambiguous," and consequently the trial court erred in awarding the plaintiff $30,000. (*Ibid*.) The court noted the inconsistent findings in the special verdicts were "apparent on the face of the verdict" and neither party objected prior to the discharge of the jury. (*Id*. at p. 1093.) The court, however, reiterated that "inconsistent jury findings in a special verdict are not subject to waiver by a party [citation] . . . ." (*Ibid*., fn. 6.) Orozco's failure to object to the special verdicts rendered by the jury does not waive or forfeit his right to litigate whether the special verdicts are inconsistent. (*Ibid*.; *Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1182 [forfeiting issue by failing to object before discharge of the jury is "not the law in California"].)

Neither did Orozco forfeit the issue by failing to object to the special verdict form. There was nothing inherently wrong with the form. Relevant to our discussion, the form (CACI VF-1100)[2] first asked the jury: "Was the property of defendant State of California in a dangerous condition at the time of the accident?" If the jury responded to that question affirmatively, it was next asked: "Did the dangerous

_____

[2] The form is based on CACI No. 1100, which in turn is based on based on Government Code section 835, the statutory provision pertaining to dangerous public property.

10

condition create a reasonably foreseeable risk that this kind of injury would occur?"

The form does not itself call for inconsistent verdicts. For example, if a plaintiff drove off the freeway and went over the embankment in the same location, stopping only once the car hits the trees planted on the slope, at which point the plaintiff got out of his vehicle and stepped into a patch of poison ivy, it is quite possible a jury would find a dangerous condition existed—an unguarded, unsafe slope—but the dangerous condition did not create a reasonably foreseeable risk of the *kind of injury* suffered by that plaintiff, i.e., being infected with poison ivy.

The problem here was not the form, but the answers to the two questions considered in light of the evidence presented at trial. Accordingly, Orzoco did not forfeit the issue of inconsistent verdicts by failing to object to the special verdict form.

B. *Inconsistent Verdicts*

As fact finder, a jury is not permitted to make inconsistent factual determinations based on the same evidence. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc., supra*, 126 Cal.App.4th at p. 682.) "Inconsistent verdicts are '"against the law,"' and the proper remedy is a new trial. [Citation.]" (*Shaw v. Hughes Aircraft Co., supra*, 83 Cal.App.4th at p. 1344; Code Civ. Proc., § 657, subd. (6).)

We review de novo whether special verdicts are inconsistent. (*Singh v. Southland Stone, U.S.A., Inc, supra*, 186 Cal.App.4th at p. 358; *Zagami, supra*, 160 Cal.App.4th at p. 1092.) In making that decision, we review the answers in the special verdict form in the context of the record, including the pleadings, the evidence, and counsel's arguments. (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 718-720 [evidence, instructions, and argument]; *Zagami, supra*, 160 Cal.App.4th at p. 1092 [pleading, evidence, and instructions].) We do not infer findings in support of different verdicts. (*Singh v. Southland Stone, U.S.A., Inc., supra*, 186 Cal.App.4th at p. 358.) "An inconsistent verdict may arise from an inconsistency between or among answers within a

11

special verdict [citation] or irreconcilable findings. [Citation.] Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law. [Citation.] The appellate court is not permitted to choose between answers. [Citations.]" (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc., supra*, 126 Cal.App.4th at p. 682.)

The state's liability for maintaining a dangerous condition on its property is set forth in Government Code section 835: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Here, the jury found the state's property—the steep embankment adjacent to the southbound lanes of SR 57—was in a dangerous condition at the time of the accident. Inconsistent with that determination was the jury's finding the dangerous condition did not "create a reasonably foreseeable risk that this kind of injury would occur." Two people died and two people were injured in the accident, as happens in car crashes at high speeds. The slope adjacent to the highway was too steep to permit a driver whose vehicle has left the road to recover control of the vehicle until it reaches the bottom of the slope. Aggravating the danger was the existence of large trees on the untraversable slope. If a vehicle hits a large tree at a high rate of speed or rolls over, injury or death is likely. As Jai Singh, an accident reconstructionist testified, "Cars generally don't do well when they hit objects such as trees and poles because . . . it

12

causes some rather massive structural compromise of the vehicle." In this case, Singh described the Nova as "really kind of mangled." For the jury to find the state's property at issue—the slope with its large trees—was in a dangerous condition *and* the injuries suffered in this case were not reasonably foreseeable is internally inconsistent.

In *Mizel v. City of Santa Monica* (2001) 93 Cal.App.4th 1059, the City of Santa Monica and a hotel maintained a dangerously designed curb. A consultant found the ramp for disabled access was dangerous due to the "variable face curb" which presented a tripping hazard and the mixing of pedestrians with vehicular traffic. (*Id*. at p. 1064.) Mizel sued after he tripped over the variable face curb and "smashed" into a vehicle. (*Id*. at p. 1065.) In its special verdicts, the jury found the hotel was negligent, the ramp and the variable face curb were dangerous conditions, the dangerous condition did not create the foreseeable risk of the kind of injury suffered by Mizel, and apportioned the fault of the hotel and the City of Santa Monica. (*Id.* at pp. 1068-1069.) The appellate court concluded the trial court did not err in providing additional instructions and having the jury deliberate further following the return of the inconsistent verdicts. (*Id*. at p. 1071.) Like the situation presented in *Mizel*, the jury in the present case found a dangerous condition existed, but the kind of injuries suffered were not reasonably foreseeable.

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.]" (*Singh v. Southland Stone U.S.A., Inc.*, *supra*, 186 Cal.App.4th at p. 357.) This determination requires consideration of the evidence admitted at trial. Here, the danger posed by the steep slope adjacent to the highway and the positioning of large trees on the slope is that a vehicle leaving the roadway will overturn on the embankment and/or hit the large eucalyptus trees on the slope. When a slope immediately adjacent to a highway has large trees on it and the slope is too severe to permit a driver whose vehicle has left the highway to recover control, and when the danger posed by the slope is that a vehicle leaving the highway will roll over and/or hit

13

the large trees, an occupant's injury or death is reasonably foreseeable.

In support for its argument that the dangerous condition did not create a reasonably foreseeable risk of the kind of injures present in this case, the Department asserts the potential of future accidents is measured by determining whether there was a high risk of a vehicle running off the road and in the 10 years preceding the present incident, the rate of accidents in the same general location was one for every 88 million vehicles driving past the crash site. The argument is misplaced. The *number* of accidents in this area may very well be determinative of whether the Department acted reasonably in failing to protect against the risk of such injuries, but not whether the *kind* of injuries suffered in this case were reasonably foreseeable.

A very small likelihood of an accident weighed against the cost of preventing such an incident through the installation of a guardrail goes to the reasonableness of the Department's action or inaction. However, where the evidence shows run-off-the-road incidents where cars have either rolled over on the steep slope or hit large trees, a finding the Department has maintained the property in a dangerous condition is inconsistent with a finding the kind of injuries suffered in an automobile crash are not reasonably foreseeable. Given the danger posed by a severe slope and large trees thereon, an answer to the question of whether the *kind* of injuries suffered were reasonably foreseeable does not turn on the *number* of accidents occurring in the same area.

Indeed, the jury could not find the Department's property was in a dangerous condition unless it found the condition of the property created a "substantial (as distinguished from minor, trivial or insignificant) risk of injury." (Gov. Code, § 830, subd. (a).) The "substantial . . . risk of injury" present in this case is the kind of injury one finds when a vehicle rolls over or hits large trees at a high rate of speed. The injuries and deaths sustained in this case are of the kind experience teaches result from automobile accidents.

14

As noted above, the verdicts in this case would not have been inconsistent had the passengers suffered cases of poison ivy as a result of the vehicle leaving the roadway and going down the embankment. Neither would the verdicts be inconsistent if the injuries suffered by the passengers as the result of the accident were being stung by a bee or bitten by a loose dog while walking away from the accident. But where the dangerous condition could result in vehicular accidents and the injuries are the type suffered in a vehicle collision, as was the case here, special verdicts finding a dangerous condition, but the injuries were not reasonably foreseeable, are inconsistent. As the Legislative Committee comment to Government Code section 835 observed: "This section requires the plaintiff to show that the injury was of a kind that was reasonably foreseeable. Thus, a person landing an airplane on a public road might not be able to recover for an injury resulting from striking a chuckhole, whereas a motorist might be able to recover for the injury resulting from striking the same hazard; for it is reasonably foreseeable that motorist will be injured by such a defect, but it is highly unlikely airplanes will encounter the hazard. (Legis. Com. com., 32 West's Ann. Gov. Code (2012) foll. § 835, p. 99.) A *fortiorari*, injuries of the kind present in a vehicle roll over or in a collision with a large tree at a high rate of speed, are more reasonably foreseeable than physical injuries resulting from a vehicle hitting a chuckhole.

This is not to say the jury could not have ultimately found in favor of the Department in this matter. As the special verdict form makes evident, even after finding a dangerous condition existed and the injuries were reasonably foreseeable, the Department would still not be liable unless the jury also found (1) the Department knew or should have known of the dangerous condition long enough to have protected against it, (2) the Department acted unreasonably in failing to take sufficient steps to prevent against the risk of injury, and (3) the dangerous condition was a substantial factor in causing the deaths of Colin and Martinez, and the injury to Mendez. (See Gov. Code, § 835 [conditions of liability for dangerous property].) Unfortunately, the jury did not

15

address these issues because it determined the injuries were not reasonably foreseeable, a decision that was—given the facts of this case—inconsistent with its finding a dangerous condition existed.

The special verdicts are inconsistent. A new trial is required, albeit a limited one. Orozco's culpability was determined by the jury. The error in rendering inconsistent verdicts in connection with the issue of the Department's liability does not affect the determination of Orozco's culpability.

## III

## DISPOSITION

The judgment in favor of the Department is reversed. The matter is remanded for retrial against the Department. In all other respects, the judgment is affirmed. Orozco shall recover his costs on appeal.

MOORE, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

THOMPSON, J.

16