[No. A053315. First Dist., Div. Two. Jan. 12, 1993.]

KENNETH SUTTON et al., Plaintiffs and Appellants, v.
DONALD WARNER et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of parts I, III, IV, V and Cross-appeal.

**COUNSEL**

Steven C. Finley for Plaintiffs and Appellants.

Lawrence M. Scancarelli for Defendants and Appellants.

**OPINION**

**KLINE, P. J.—**

### Introduction

Arlene and Donald Warner appeal from a judgment granting specific performance of an oral agreement to purchase real property in favor of respondents Gloria and Kenneth Sutton. The Warners contend on appeal that substantial evidence does not support the judgment and that numerous errors of law compel reversal.

The Suttons cross-appeal the denial of relief on their cause of action for damages for alleged bad faith denial of contract. We shall affirm.

*Statement of Facts*[1]

In 1983, Arlene Warner inherited a one-third interest in a home at 101 Molimo Street in San Francisco, and in a second property located in the Russian River area of California. She and her husband, Donald Warner, had no interest in retaining the Molimo Street property. They did, however, desire to retain the Russian River property. In order to obtain full title to both properties, the Warners bought out the other heirs, which required them to obtain a loan for $170,000. The Molimo Street property, having a value of approximately $185,000, could not support a loan in that amount by itself. Therefore, the Warners intended to pledge both properties as collateral for the $170,000 loan. They could not afford the payments on that mortgage and therefore sought assistance from others.

Donald Warner and Kenneth Sutton were friends. Warner suggested to Sutton in October of 1983 that the Suttons rent the Molimo Street property. The Suttons became tenants and made all rent payments in cash.

In January 1984, Donald Warner proposed that the Suttons purchase the residence so that the estate could be settled. His proposal included a $15,000 down payment towards the purchase price of $185,000. According to the Suttons, they were to have five years to purchase the home after the Warners obtained a loan necessary to acquire the two properties. In addition, under the terms of this agreement, the Suttons were required to make all mortgage payments and real estate tax payments. In sum, the Warners were not to have to make any payments on the Molimo Street property. The property was transferred out of the estate to Arlene Warner after April 1984.

John Murphy, a long-time acquaintance of Kenneth Sutton and Donald Warner, testified that he overheard discussions between the two which supported Sutton's version of the contract. In fact, he testified that Warner had created a jingle, "4-9-89," which Warner told him was the ending date of the Suttons' option to purchase the Molimo Street property. Murphy testified that he recalled Warner reciting this jingle on multiple occasions over the years.

Donald Warner confirmed that, but for the sale of the Molimo Street property to the Suttons, he and his wife would not have acquired the

---

[1]The statement of facts is taken in large part from the statement of decision issued by the trial court, which contains an accurate summary. Additional facts are found in the discussion of issues to which they relate.

Unless otherwise indicated, references to "Warner" and to "Sutton" in the singular are to Donald Warner and Kenneth Sutton, respectively.

remaining interests in that property. He admitted receipt of the $15,000, but testified that the Suttons had only six months in which to exercise their option, or they would lose their interest in the property. He testified that he extended that option on two occasions until he finally told them, in January of 1986, that he would not extend it again. This would have required an increase in the value of the property from $185,000 to in excess of $200,000 to support a conventional loan of $170,000 in six months' time. Further, it would have required the Suttons to pay points and closing costs twice in a six-month period. The court found the Warners' version of the contract neither credible nor reasonable.

Kenneth Sutton testified that he and his wife had made a number of improvements to the property in reliance upon the oral purchase agreement. Sutton also testified that he was concerned about proof of payment of the down payment, since the Warners were frequently traveling to and from the Russian River property. He requested a receipt for the $15,000 so he would have proof of payment should the Warners die. Sutton testified that Warner gave him a previously prepared one-page memorandum, exhibit 2, dated April 4, 1984. This document acknowledged the receipt of the $15,000, identified the property, and evidenced the obligation of the Warners to sell the property to the Suttons.[2] The Suttons maintained that this document was not the contract and that they intended to have a formal contract prepared.

Shortly after execution of the receipt, the Warners began the process to obtain the $170,000 loan. The loan transaction closed in late summer or fall of 1984. Up to that time, the Suttons had paid $1,000 per month in rent. Upon consummation of the financing, they began paying an increased amount. The Suttons contended that they paid the sum of $1,881 per month in cash commencing in September 1984. This was equal to the full amount of the new loan's monthly mortgage payment. The Suttons continued to pay the full amount of the mortgage payment each and every month in cash until 1987, when they began using checks to be able to evidence their ability to pay to a potential lender. The Suttons contended they paid $100 per month toward reimbursement of the $8,000 in closing costs on the original $170,000 loan. The Warners denied this. The Suttons further contended that the Warners had not been damaged because the $8,000 came out of the purchase money loan, which they were repaying.

---

[2]The document provided: "Received from Kenneth Sutton the amount of $15,000 toward the purchase of 101 Molimo, San Francisco. In any event where me, Donald L Warner and my wife, Arlene M Warner die, Ken Sutton is to have first option of buying 101 Molimo at the price of $185,000 minus the $15,000 already received[,] leaving a $170,000.00 Balance. If Mr. Sutton cannot buy the house at 101 Molimo he is to paid [sic] $15,000 out of our estate and said property to be sold. Mr. Sutton has 6 months to buy and must pay rent to meet agreement at $1000.00 per month. [¶] S/ Donald L Warner and Arlene M Warner."

Kenneth Sutton testified that the variable rate mortgage declined to $1,654 in 1985. He produced evidence of cash deposits to the Warners' checking account in exactly that amount. In September of 1986, the mortgage amount was fixed at $1,544. Although there were numerous checks after that date for the sum of $1,500, Warner confirmed that he received $44 in cash on multiple occasions from the Suttons in addition to the monthly rent check for $1,500.

Sutton testified that in late 1986, he, his wife, and Warner traveled to Santa Rosa to meet with Susan Cohen to explore creative financing for the house. She suggested that they either put money in the bank to get a loan or that the Warners obtain a separate loan on the Russian River property. Warner claimed they discussed financing for a purchase at the current market value. Cohen was not called to testify.

Thereafter, in January 1987, a meeting occurred at the Molimo Street property with the Suttons, the Warners, and Attorney Garrett Checcini representing the Suttons. According to Checcini, the purpose of the meeting was to formalize the arrangement between the parties. Checcini testified that he was willing to cosign a loan to enable the Suttons to obtain financing. Kenneth Sutton summarized the terms of the agreement, to the effect that the original purchase price was $185,000, that a down payment of $15,000 had been made, along with additional paydowns on the principal balance. No objection to these facts was voiced by either Donald or Arlene Warner. Checcini testified that no agreement was consummated at that meeting because Donald Warner consumed a six-pack of beer during the forty-five-minute meeting and became inebriated. According to Checcini, Arlene Warner ended the meeting by telling Checcini that she would have her lawyer contact him. He waited a period of time and then wrote them, seeking to consummate the transaction.

During this period, the Suttons continued to pay rent in the amount of the mortgage payments, which Donald Warner testified was, coincidentally, the fair rental value of the property. Meanwhile, the value of the property rose to somewhere between $250,000 and $320,000.

Witness Carol Chapman testified that in the spring of 1987, she and the Suttons were at the Suttons' home when Warner arrived unexpectedly. They discussed the purchase and sale of the house and, in an attempt to put the matter to rest, Chapman prepared a written memorandum of the parties' agreement. Chapman's testimony was consistent with the version of the contract proffered by the Suttons. Additionally, at this time Warner offered to obtain a separate loan for the Russian River property, in return for

payment of $12,500. Donald Warner denied any recollection of the meeting. He testified at deposition that he was not present at the meeting because it was Memorial Day and he was at the Russian River home. When confronted with the fact that it was not Memorial Day, he testified that he was so intoxicated that he had no recollection of the meeting.

The Warners refinanced the loan in April 1988, obtaining a $199,000 loan, which paid off the Russian River property. The Molimo Street residence had appreciated significantly and was then able to carry the loan on its own. The principal balance paid off with refinancing was the sum of $166,929.96.

In July 1988, the Warners offered, through counsel, to sell the property to the Suttons for $250,000, which they contended was less than its fair market value. The Suttons did not dispute the value of the property. A letter from Warners' counsel at this time also advised the Suttons that in the event they did not exercise the option to purchase the property for that sum, their rent would be increased, based on the permissible increases under the San Francisco Rent Stabilization Act. That rent was calculated on the standard increases based on a rent which equalled the original mortgage payments in 1984, confirming the Suttons' contention that they had paid the full mortgage.

Upon the Suttons' receipt of the letter from the Warners' attorney, this litigation ensued.

## I.

### Substantial Evidence Supports Oral Agreement*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## II.

### Statute of Frauds

The Warners contend that the statute of frauds prevents enforcement of the agreement and that there is no substantial evidence of part performance by the Suttons or of equitable estoppel sufficient to take the agreement outside the operation of the statute.[6] The record supports the trial court's determination that part performance by the Suttons sufficed to remove the bar of the statute.

---

*See footnote, *ante*, page 415.

[6] Code of Civil Procedure section 1971 requires a writing for creation of an estate or interest in real property. Code of Civil Procedure section 1972 states that "Section 1971 shall

■ The doctrine of part performance by the purchaser is a well-recognized exception to the statute of frauds as applied to contracts for the sale or lease of real property. (1 Miller & Starr, Cal. Real Estate 2d (1989) § 1:60, p. 168.) "Under the doctrine of part performance, the oral agreement for the transfer of an interest in real property is enforced when the buyer has taken possession of the property *and either* makes a full or partial payment of the purchase price, *or* makes valuable and substantial improvements on the property, in *reliance* on the oral agreement." (1 Miller & Starr, *supra*, § 1:60, p. 168, italics in original, fn. omitted.)[7] Payment of the purchase price alone, without the buyer obtaining possession or making substantial improvements to the property, is not sufficient part performance to preclude application of the statute of frauds. (1 Miller & Starr, *supra*, at p. 170.) The part performance by the buyer must clearly relate to, and must be pursuant to, the terms of the oral agreement. (*Paul* v. *Layne & Bowler Corp.* (1937) 9 Cal.2d 561, 564 [71 P.2d 817]; 1 Miller & Starr, *supra*, at p. 169; 1 Witkin, Summary of Cal. Law, *supra*, at p. 300.) It is well recognized "that the part performance doctrine rests on estoppel and virtual fraud rather than on ideas of livery of seisin or on evidentiary considerations." (1 Witkin, Summary of Cal. Law, *supra*, § 321, at p. 301; see 1 Miller & Starr, *supra*; Rest.2d, Contracts, § 129 and accompanying Reporter's Notes p. 326.) Two distinct elements underlie application of the part performance exception: "first, the extent to which the evidentiary function of the statutory formalities [of the statute of frauds] is fulfilled by the conduct of the parties; second, the reliance of the promisee, providing a compelling substantive basis for relief in addition to the expectations created by the promise." (Rest.2d, Contracts, § 129, com. b., p. 322.)

■ The Warners contend that the Suttons could not demonstrate adequate part performance, as they never entered possession pursuant to the oral agreement. Rather, they originally took possession as tenants and continued in possession after the making of the oral agreement.

■ Possession must be more than a "mere technical possession, not open to observation of the neighborhood, and capable of being proved only by select and confidential witnesses . . . ." (*Hambey* v. *Wise* (1919) 181 Cal. 286, 290 [184 P. 9].) It must be actual, visible, notorious and exclusive, so that it manifests clearly that the buyer is claiming and asserting a distinctive ownership of the property inconsistent with the right of possession or

---

not be construed to abridge the power of any court to compel the specific performance of an agreement, in case of part performance thereof." (Code Civ. Proc., § 1972, subd. (a).)

[7]Witkin's formulation of the doctrine states that California recognizes *possession alone* as sufficient to support a finding of part performance. (1 Witkin, Summary of Cal. Law, (9th ed. 1987) Contracts, § 320, pp. 300-301.)

ownership in any other person. (*Wood* v. *Anderson* (1926) 199 Cal. 440, 445 [249 P. 862]; see 1 Witkin, Summary of Cal. Law, *supra*, at p. 321; 1 Miller & Starr, Cal. Real Estate 2d *supra*, p. 170.)

■ At the same time, as the trial court recognized, continued possession, under the circumstances presented, did not preclude part performance. To apply a transfer of possession requirement to preclude former tenants from ever establishing an oral contract to purchase would be unjust under the circumstances of this case. ■ Authorities considering the issue of continuing possession agree that the " 'continuance in possession by a purchaser who is already in possession may, in a proper case, be sufficiently referable to the parol contract of sale to constitute a part performance thereof. There may be additional acts or peculiar circumstances which sufficiently refer the possession to the contract. So, a prior possession by the purchaser is not an absolute bar to proof of a change in the character of the possession after the making of a parol contract of sale, although it may cast upon the purchaser the burden of showing that his continued possession is referable to the contract. . . .' " (*Herbstreith* v. *Walls* (1946) 147 Neb. 805 [25 N.W.2d 409, 411], quoting 49 Am.Jur., Statute of Frauds, § 442, p. 748; see also Rest.2d, Contracts, § 129, *supra*; Annot. (1941) 125 A.L.R. 1468, 1469; cf. *Boesiger* v. *Freer* (1963) 85 Idaho 551 [381 P.2d 802, 805].) In an illustration strikingly similar to the present case, the Restatement Second of Contracts acknowledges that a transfer of possession is not always required to support part performance where the purchaser has taken additional actions in reliance on the oral agreement:

"A leases a residence to B for $9 per month. After four months A and B agree to a written contract for sale of the premises for $1,000 in monthly installments of $12.89, but the contract is not signed. B pays $12.89 each month for thirteen months and pays for taxes and insurance. Then the land increases in value because an air base is located nearby, and A repudiates the contract. B is entitled to specific performance." (Illus. No. 6, p. 324, based upon *Herbstreith* v. *Walls, supra,* 25 N.W.2d 409.)

■ The question here, then, is whether the continued possession of the property by the Suttons and their other actions are sufficiently related to the parol option contract to constitute part performance. The trial court responded in the affirmative. After entering the oral agreement, the Suttons made a $15,000 down payment and increased their monthly payments to the Warners from the original $1,000 per month rental payment to payments in the precise amount of the variable mortgage payments due under the $170,000 loan. They reimbursed the Warners for property taxes in the sum of $800 every six months. Although it was disputed whether the dollar value

of improvements made by the Suttons in reliance upon the oral agreement constituted "substantial" improvements, it is undisputed that many of the improvements—such as painting the interior of the house and the installation of a toilet and entry lamp—were done by the Suttons' own labor. The trial court found that these actions were unequivocally related to the purchase agreement. We cannot gainsay this determination. Furthermore, the Warners did not dispute the *existence* of an oral lease-option agreement. Rather, the dispute centered upon when the option would expire. The actions taken by the Suttons in reliance upon the oral agreement, when considered together with the Warners' admission that there was an oral agreement of some duration, satisfy both elements of the part performance doctrine—evidence of the existence of the oral contract on the terms found by the court and reliance by the Suttons upon that contract warranting specific performance relief.

III.-V., CROSS APPEAL*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Benson, J., and Phelan, J., concurred.

A petition for a rehearing was denied February 4, 1993, and the petition of defendants and appellants for review by the Supreme Court was denied March 24, 1993.

*See footnote, *ante*, page 415.