Filed 7/28/16  Skorick v. Karanikolas CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOHN SKORICK, | B263672 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. EC061052) |
| v. | |
| KRISTEN KARANIKOLAS et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Norman P. Tarle, Judge.  Affirmed.

Dillon Gerardi Hershberger Miller & Ahuja and Timothy P. Dillon for Defendants and Appellants.

Douglas S. Draper for Plaintiff and Respondent.

_____

Kristen Karanikolas and her mother, Diane Pape (collectively Appellants), appeal from a superior court judgment awarding Karanikolas's former fiancé, John Skorick, $140,000 after a jury found Appellants agreed, but failed, to repay Skorick for his investments in the Appellants' property. Appellants contend the trial court erred in (1) not issuing a judgment notwithstanding the verdict because (a) Skorick's alleged oral contract with Appellants violated the statute of frauds and (b) his money had and received claim was time barred; (2) not ordering a new trial after the jury rendered fatally inconsistent special verdicts; and (3) not admitting the verified complaint, which prejudiced them. We disagree and affirm.

## BACKGROUND

Pape's mother, and Karanikolas's grandmother, Mary Pape, owned the property at issue until her death in 2006. Pape and Karanikolas lived with her. Upon her death, she willed the property to her three children, including Pape, in equal shares; at the same time, Karanikolas's now ex-husband, Sean Montgomery, moved into the property. In 2007, Pape and Karanikolas refinanced the property to "buy out" Pape's siblings. The refinance produced $350,000. Karanikolas and Pape also borrowed $100,000 from Montgomery for the buyout, and Montgomery secured his loan with a second deed of trust on the property. Pape and Karanikolas successfully bought out Pape's siblings and Pape and Karanikolas became 50/50 joint owners of the property.

In 2008, Karanikolas and Montgomery married. By 2009, however, Karanikolas and Montgomery had separated, and in 2010 they divorced. Montgomery never had an ownership interest in the property.

Karanikolas and Skorick began dating at the end of 2009. During their whirlwind courtship, Skorick showered Karanikolas with lavish gifts and was also generous with Pape. In early 2010, Karanikolas and Skorick decided to live together. Skorick planned to relocate from his Arizona home to Karanikolas and Pape's home in May 2010.

Skorick testified that as part of the plan for Karanikolas and himself to build a life, he, Karanikolas, and Pape orally agreed that he would move into the property and acquire an ownership interest in it, and Pape would move out. As to his interest, Skorick testified

2

that the group agreed he would pay off Montgomery's $100,000 lien in exchange for half of Karanikolas's half interest and pay Pape $50,000 a year for four years, totaling $200,000, in exchange for her half interest. In sum, Skorick would acquire a 75 percent interest in the property (25 percent from Karanikolas and 50 percent from Pape). Appellants deny agreeing to these terms.

Appellants testified the group had a different "understanding." Appellants contend they always had an unofficial agreement that Karanikolas would refinance the property and with the proceeds buy out Pape at $200,000, although they had no firm plan as to how or when this transfer would occur. Once Skorick arrived, however, their plan changed. Karanikolas contends that instead of refinancing, Skorick would gift her with $200,000 to buy out Pape. Karanikolas testified she believed Skorick would become an owner through marriage after they wed, not because he had contributed cash to buying out Pape.[1]

On May 11, 2010, Skorick paid Karanikolas $10,000, which she then paid to Montgomery. On January 4, 2011, Skorick paid Karanikolas an additional $80,000, which she again paid to Montgomery. Although these payments totaled only $90,000 of Montgomery's $100,000 lien, Skorick testified that Montgomery filed a full reconveyance of his deed because Karanikolas had negotiated "the amount of the lien down" with Montgomery.

On May 6, 2010, Skorick paid Pape $12,000. On November 15, Skorick paid Pape an additional $20,000. Skorick also paid Pape's rent for a year, totaling $18,000, which the parties agreed at some point would count toward Skorick's buyout of Pape. In sum, Skorick made payments to or on behalf of Pape totaling $50,000.

Skorick did not include his payments to or on behalf of Karanikolas or Pape on his tax returns and did not list the property, or his interest in it, as an asset on any credit

---

[1] It is unclear whether Karanikolas knew that ordinarily under California community property law, if the $200,000 were truly a gift, the property would be her separate property and Skorick would not obtain an interest in the property merely by marriage.

reports. Both Pape and Karanikolas characterize the payments from Skorick as gifts which they were not obligated to repay.

By early 2011, Skorick's income dwindled. As planned, Skorick stopped paying Pape's rent in April 2011. Thereafter, Karanikolas began paying it. Karanikolas and Skorick's romance petered out and was over by the end of 2011. Skorick testified that when he moved out, he considered himself a three-eighths owner of the property because he had obtained one-half of Karanikolas's half interest and one-quarter of Pape's half interest (for paying her $50,000 of their agreed $200,000). Karanikolas and Pape deny that Skorick was an owner or that he communicated to them that he believed himself to be an owner. Skorick testified he admittedly did not communicate he thought he had an ownership interest until some months later. In fact, Karanikolas testified that Skorick even affirmatively told her he did not expect her or Pape to return the money because he had " 'fucked up [her] life enough as it is.' "

In June 2012, Skorick e-mailed Karanikolas, asking whether refinancing was possible to allow him to " 'get some money out' " of the property. He testified he believed that any refinance proceeds would be the fruits of his equity in the property, not a repayment of the funds he invested. On October 24, 2014, Skorick again emailed Karanikolas, asking how he could get " 'a chunk of what I put in' " out of the property. Although Karanikolas and Skorick were in communication between June and October 2012, there is no evidence that Karanikolas acknowledged Skorick's requests or affirmed that he had equity or an ownership interest in the property.

On November 5, 2012, Karanikolas and Skorick spoke by phone. Skorick claims they orally modified the original agreement, with Karanikolas speaking on behalf of herself and Pape. Skorick contends he agreed to give up his three-eighths interest in the property in exchange for repayment of the $140,000 he invested, which Karanikolas was to obtain by refinancing the property. Karanikolas, on the other hand, claims they discussed Skorick's financial condition, but not any agreement.

On July 12, 2013, Skorick sued Karanikolas and Pape for constructive trust, resulting trust, quiet title, equitable lien, and breach of oral contract. Skorick primarily

4

contended that he had collectively paid Appellants $140,000, which entitled him to a three-eighths ownership interest in the property, but that Appellants had not conveyed his interest to him. Appellants replied with a demurrer and a motion for judgment on the pleadings.[2] In response, Skorick filed a first amended complaint (FAC) wherein he abandoned his quiet title and resulting trust causes of action and added a money paid, or money had and received, cause of action. He also changed his allegations, claiming he and Karanikolas orally modified their original oral agreement to allow Karanikolas and Pape to repay Skorick his $140,000 investment in return for Skorick giving up his three-eighths interest in the property. Appellants demurred to the FAC, alleging the original complaint and FAC contained inconsistent and contradictory allegations. The court sustained Appellant's demurrer without leave to amend as to the constructive trust and equitable lien causes of action.

After several other failed defensive motions by Appellants, a jury heard the case. At the trial's conclusion, the jury issued four special verdicts, one for each Karanikolas and Pape as to the breach of contract and money had and received causes of action. The jury ruled in Skorick's favor, awarding him $140,000 total, with $90,000 against Karanikolas and $50,000 against Pape. Appellants moved for judgment notwithstanding the verdict, or, in the alternative, a new trial. The court denied both motions, saying the trial "could have gone either way," and, in the judge's view, the case pivoted on "the credibility of the witnesses." Appellants appealed.

## DISCUSSION

On appeal, Appellants argue the trial court erred because (1) the oral agreement violated the statute of frauds, (2) the statute of limitations barred the money had and received claim, (3) the special verdicts were fatally inconsistent, and (4) it did not admit the verified complaint.

---

[2] The parties did not include these documents in the record on appeal, although they did include a case summary which indicates Appellants filed both documents.

When reviewing the denial of a judgment notwithstanding the verdict, we determine whether substantial evidence supported the underlying verdict. (*Dell'Oca v. Bank of New York Trust Co., N.A.* (2008) 159 Cal.App.4th 531, 554–555.) Substantial evidence is evidence "which is reasonable in nature, credible and of solid value." (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1057.) We construe every fact and inference in favor of the judgment and disregard those unfavorable. (*Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 24.) We do not substitute our judgment for the court's by reweighing evidence or credibility determinations. (*Ibid.*; *Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762.)

We review special verdicts de novo to determine whether they are inconsistent. (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 585 (*David*).)

**A.    The court did not err in upholding the jury's verdict**

**1.    The amended oral agreement does not fall within the statute of frauds**

**a.    The parties could not, and did not, transfer interest in the property**

Appellants contend the alleged oral modification allowing Appellants to pay Skorick $140,000 in exchange for him relinquishing his claim to a three-eighths interest in the property falls within the statute of frauds because it was a transfer of interest in real property. Under Civil Code section 1624, subdivision (a)(3), a contract must be in writing if it is an "agreement for . . . the sale of real property, or of an interest therein." Code of Civil Procedure section 1971 is in accord: "No . . . interest in real property . . . can be created, granted, assigned, surrendered, or declared, otherwise than by operation of law, or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering, or declaring the same, or by the party's lawful agent thereunto authorized by writing."

Appellants further argue the oral modification, unlike the original agreement, was not excepted by the part performance doctrine because Skorick presented no evidence he

6

performed in any qualifying way to invoke the exception.[3]  Skorick does not argue, however, that the modification was excepted from the statute.  Instead, he argues that the modification did not fall under the statute at all because the "rescission of a written contract for the purchase and sale of an interest in real property may be accomplished by an oral agreement." (*Hastings v. Matlock* (1985) 171 Cal.App.3d 826, 837 (*Matlock*).)

Appellants counter that *Matlock* is inapplicable because it involved a *contemplated* transfer of interests which never occurred and Skorick claimed at trial he was entitled to, *and did*, acquire and then exchange a three-eighths ownership interest in the property.[4] We disagree and apply *Matlock*.

Although *Matlock* and the cases it cites, and the cases citing to it, are not entirely factually on point, their general reasoning that valid real estate contracts may be rescinded orally when no actual transfer of ownership interest in real property occurs is applicable.  Here, despite Skorick's testimony, he was not a three-eighths owner in the property at the time of the modification.  The original agreement was for Skorick to become a 75 percent owner *after* he had paid off Montgomery's $100,000 lien on behalf of Karanikolas and paid Pape $200,000 over the course of four years.  Neither of those conditions fully occurred, however.  Skorick paid only $90,000 of the $100,000 lien and

---

[3] At trial, Skorick argued the original oral agreement (for him to acquire a 75 percent interest in the property in exchange for $300,000) was excepted from the statute of frauds under the part performance doctrine.  The part performance doctrine permits otherwise invalid oral contracts for the transfer of real property interests to be enforced when the party seeking to enforce the contract takes possession of the property and either makes full or partial payment of the purchase price or substantially improves the property in reliance on the agreement.  (*Sutton v. Warner* (1993) 12 Cal.App.4th 415, 422.)  Skorick argued his occupation of the property and payment of property-related expenses satisfied the part performance doctrine.  On appeal, Appellants also do not appear to challenge the exception of the original agreement from the statute of frauds.

[4] On appeal, Skorick argues that the ownership interest never transferred and he merely had a claim to it.  Not only is this position incorrect (as explained below), but we will not ascribe Skorick's current argument to his position at trial when it is clear his position then was that he was a three-eighths owner.

paid only a quarter of what he owed Pape.[5]  Because the agreement's conditions were not met, and absent a subsequent alternate ownership agreement (which neither party argues exists), Skorick did not become a three-eighths owner of the property merely because he paid part of what he promised.  In fact, Skorick was not even entitled to become a three-eighths owner because the parties never agreed he would obtain ownership interests after each payment.  Supporting the fact that Skorick was not in fact an owner, Karanikolas or Pape never put him on the property's title nor is there any writing evidencing Karanikolas or Pape transferred a three-eighths equitable ownership interest to Skorick, even if they had not yet, or would not, legally transfer title.

Because Karanikolas and Pape never transferred their interest to Skorick, the rescission here is contemplated by *Matlock* and does not fall under the statute of frauds because no interests were transferred either after Skorick made payments or after the modification.  Whether Skorick believed he had acquired a three-eighths interest, or a right to such an interest, or that the modification transferred such an interest is irrelevant to the question of whether the transfer actually occurred.

### b.  The jury reasonably could have upheld a version of the modification different from Skorick's account

The jury need not have accepted Skorick's precise version of the modification's terms to find in his favor.  The jury's special verdicts do not specify on what grounds the modification rested.  It is possible, based on the evidence, the jury found that the

---

[5] Even assuming Skorick's position is correct, it is somewhat unclear whether Skorick's payment of $90,000 to Karanikolas to extinguish her ex-husband's $100,000 lien would have been sufficient to allow Skorick to claim half of Karanikolas's half-share.  When the parties made the original agreement, the lien was valued at $100,000, or half of the $200,000 Skorick was going to pay Pape for her full half-share.  Because the parties do not argue that Pape's and Karanikolas's half-shares were somehow valued differently, it is reasonable to assume that the parties valued half of Karanikolas's half-share at $100,000.  It is unclear whether the parties considered the extinguishment of the lien as a rough ($10,000 deficient) substitute for the $100,000 cash value of half of Karanikolas's half-share, but arguably Karanikolas could have contended Skorick owed her an additional $10,000 to acquire half of her half-share.

8

modification was an agreement to simply "undo" the original contract and compensate the steps Skorick had taken to fulfill it. Under this scenario, Skorick relinquished his right to any claims against Appellants in exchange for the return of the money he paid toward obtaining ownership interests. Even if at trial Skorick appeared to be mistaken about precisely what he was relinquishing, the jury could have found that the rescission was proper because the parties intended to simply "undo" the original deal, which contemplated the transfer of interests but which never materialized because Skorick had not met its terms.

In addition, the jury reasonably could have found Karanikolas and Skorick's marriage was an implied, but unmet, condition of the original agreement. Karanikolas testified that Skorick made payments only because she and Skorick thought they would be married. She also testified that she thought Skorick would become an owner only after they married. Both parties agree that Skorick stopped making payments to or on behalf of Pape after he and Karanikolas ended their relationship. From these facts and testimony, the jury could have reasonably found that marriage was an implied term of the contract, and the demise of Karanikolas and Skorick's relationship was grounds for unwinding the contract.

**2.      The statute of limitations does not bar the money had and received claim**

Appellants contend that Skorick's money had and received claim is time barred. According to Appellants, case law dictates that a money had and received claim accrues at the receipt of the funds and must be brought within two years of that date. (*Whittle v. Whittle* (1907) 5 Cal.App. 696, 699; *Fall v. Lincoln Mortgage Co.* (1931) 115 Cal.App. 651, 654 ["Ordinarily an action for money had and received must be commenced within two years after the money is received"].) Appellants argue Karanikolas and Pape received the money in 2010 and 2011 under the original agreement but Skorick did not bring his suit until 2013.

Skorick agrees a money had and received claim must be brought within two years from when the cause of action accrues, but disputes when the cause of action here

9

accrued. He argues a plaintiff must demand return of the money before the cause of action accrues (*Rose v. Foord* (1892) 96 Cal. 152, 154), and he did not demand return of the money until after the modification in 2012.

We agree with Skorick, given the facts of this case. When Skorick made payments to Appellants in 2010 and 2011, Skorick and Karanikolas were still in a relationship and planning a future together which included joint ownership of the property. According to Skorick, during 2010 and 2011 he was in the *process* of making payments to Appellants over a four-year period and that Appellants were applying the payments he had made and would apply future payments toward his ownership interest. Skorick also mistakenly believed that when he moved out in 2011 Appellants had used his payments to give him a three-eighths ownership interest in the property. If Skorick in fact believed Appellants had used his payments to make him an owner, it is logical that he did not ask for the return of his money when he moved out or in the following months. His testimony regarding his request in 2012 to Karanikolas to refinance supports this position. He testified he believed that any money he received as the result of Karanikolas refinancing would be because he had equity in the property, not because Karanikolas was repaying him at his request. It was only after the parties agreed to modify the contract that Skorick thought Appellants owed him money. Therefore, the money had and received cause of action did not accrue until after the modification had been made and Appellants refused to return Skorick's money.

**B.**      **Appellants did not demonstrate the verdicts were "fatally inconsistent"**

Appellants argue that the special verdicts were "fatally inconsistent" and warrant a new trial. (*David*, *supra*, 226 Cal.App.4th at p. 585 [" 'The proper remedy for an inconsistent special verdict is a new trial' "].) Special verdicts are inconsistent when they are "beyond possibility of reconciliation under any possible application of the evidence and instructions." (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 540, overruled on other grounds by *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548.) "The appellate court is not permitted to choose between inconsistent" special verdict answers (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682

10

(*City of San Diego*)) and, if the verdicts are inconsistent, the court may "not infer findings in favor of the prevailing party" (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 (*Zagami*)).

Appellants have not shown the special verdicts were "fatally inconsistent." In regard to the breach of contract special verdict against Karanikolas, Appellants claim "the jury found that [Karanikolas] and [Skorick] entered into a contract in April of 2010, whereby Skorick purchased a 25% interest in the . . . Property in exchange for his payment of $90,000."[6] Not so. The jury merely answered yes to the question, "Did John Skorick and Kristen Karanikolas enter into a contract?" The jury did not necessarily find that Skorick purchased a quarter interest in the property based on its responses. Instead, and given the evidence, the jury could have determined that Skorick agreed to pay off Karanikolas's ex-husband's $100,000 lien in exchange for a quarter interest in the property, assuming he and Karanikolas wed.

Appellants further claim the jury found that "[p]ursuant to the November 2012 modification, Skorick relinquished his interest in the . . . Property in exchange for the return of his $90,000. Karanikolas did not return the $90,000, thereby causing [Skorick] damage in the amount of $90,000." Again, not so. The jury merely answered "yes" to the questions, "Was the contract modified in November 2012 to require Kristen Karanikolas to return $90,000 to John Skorick?" and "Did John Skorick do all, or substantially all of the significant things that the modified contract required him to do?" and "no" to the question, "Did Kristen Karanikolas return $90,000 to John Skorick?" The jury did not necessarily find that Skorick had an actual interest and agreed under the modification to relinquish it. Based on the facts and given the limited special findings, a reasonable interpretation of the special verdicts is that the jury found that the parties

---

[6] The substance of the analysis for Karanikolas and Pape is interchangeable on the issue of inconsistent verdicts and therefore we apply the substantive analysis to Pape as well. We use Karanikolas's name and facts for convenience because the special verdicts are specific to Karanikolas and Pape.

11

merely mutually agreed to rescind their agreement because Karanikolas and Skorick decided not to wed.

In regard to the money had and received special verdict, the jury answered "yes" to the question, "Did Kristen Karanikolas receive money from John Skorick that was intended to be used for the benefit of John Skorick?" and "no" to the questions, "Was the money used for the benefit of John Skorick?" and "Has Kristen Karanikolas given the money back to John Skorick?"

Appellants argue the "jury's verdict forms are irreconcilably in conflict [*sic*], because the $90,000 [Skorick] gave Karanikolas was used for his purchase of one-quarter interest in the real property, and thus was used for [Skorick's] benefit as payment toward that purchase. Yet, in Special Verdict #2, the jury expressly found that the money was <u>not</u> used for the benefit of" Skorick. We disagree for two reasons.

First, the first sentence of Appellant's contention contains conflicting statements. One phrase states that the money Skorick gave Karanikolas "was *used* for his *purchase* of one-quarter interest in the real property," but a later phrase says the money was used "as *payment toward* that purchase." (Italics added.) Perhaps the sentence is merely ineloquently worded, but those two phrases have different meanings and repeat Skorick's misunderstanding of his interests. Again, Skorick did not actually acquire even a fractional interest in the property at any point and therefore the first phrase ("*used* for his *purchase*") is incorrect; the second phrase (used "as *payment toward* that purchase") is more correct. (Italics added.) Yet even considering only the accurate second phrase, we still cannot say that the jury necessarily found in its breach of contract special verdict that Skorick benefited from the contract at issue. Appellants' analysis assumes the contract at issue is the original contract, but this is not so. The relevant contract is the oral modification or rescission. After Skorick and Appellants agreed to rescind their contract, Appellants kept Skorick's money, claiming it was a gift. Skorick was left without a marriage, without an ownership interest, and without his cash. Assuming this version of the facts, Skorick was not benefited after the parties agreed to unwind their deal.

12

Second, Appellants cite no persuasive authority that these types of special verdicts are inconsistent.**7** For example, many of Appellants' cited cases concern conflicts between special and general verdicts, but those conflicts are governed by a standard different from the one for conflicting special verdicts.**8** In addition, reversed cases with conflicting special verdicts have dissimilar facts.**9** For example:  A jury valuing a piece of equipment as $15,500 in one special verdict but $30,000 in another (*Zagami*, *supra*, 160 Cal.App.4th at pp. 1093–1094) or a jury valuing units of land as $445,000 in one special verdict but $850,000 in another (*City of San Diego*, *supra*, 126 Cal.App.4th at p. 673).  As other examples:  A jury indicating a car was negligently designed in one special verdict but had no design defect in another (*Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1182) or a jury finding that defendants had not misrepresented facts to the plaintiff in one special verdict but finding that defendants had intentionally or recklessly misrepresented an important fact in another (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 359).  Finally:  A jury exonerating a retailer but also finding a wholesaler liable, even though as a matter of law if the wholesaler was liable

---

**7** Appellants even cite some cases where the court held the verdicts were consistent.  (E.g., *Hasson v. Ford Motor Co.*, *supra*, 19 Cal.3d 530; *David*, *supra*, 226 Cal.App.4th 578.)

**8** "[P]rinciples governing review of a claim of inconsistency in a verdict depend on the type of verdict rendered. . . . [¶] Inconsistency between special findings of fact and a general verdict is analyzed under a different set of rules[—]Code of Civil Procedure section 625 . . . ."  (*City of San Diego*, *supra*, 126 Cal.App.4th at pp. 678–679.)

**9** The facts were also different in the cases Appellants cited that are governed by Code of Civil Procedure section 625.  For example, in *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344–1346, a jury found that a defendant had breached the covenant of good faith even though it found that the defendant had not breached the underlying contract.  Unlike here, both causes of action stemmed from the same legal theory (breach of contract).  Or, in *Morris v. McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 970, a jury awarded damages to an injured child's guardian but not to the child, even though the guardian's claims were derivative of the child's.  Unlike here, one cause of action was directly predicated on another.

13

the retailer was also. (*Cavallaro v. Michelin Tire Corp.* (1979) 96 Cal.App.3d 95, 99–100.) No such apparent discrepancy occurred here.

If anything, case law suggests special verdicts based on the same set of facts, but different legal theories, may be decided by a jury so long as the damages award is not duplicative. In *Zagami*, the court allowed a jury to render special verdicts in connection with a breach of contract cause of action, but also on common counts of goods and services rendered[10] and open book account,[11] based on the same set of facts. (*Zagami*, *supra*, 160 Cal.App.4th at p. 1086.) After informing counsel that the draft special verdict forms based on these three causes of action were " 'confusing' " in that they " ' posed a risk of allowing 'duplicative damages,' " the "court instructed the jury that if it found liability on more than one cause of action, an award of damages would be limited to the value of the [property] and rent, and only one damage figure would apply to each and every cause of action." (*Id*. at p. 1088.) Here, although the jury found Appellants liable on overlapping causes of action, it does not appear, and Appellants do not argue, that the jury awarded Skorick duplicative damages.

We will not hold the special verdicts were "fatally inconsistent" when the jury could have found Skorick did not necessarily benefit from the oral modification, and the jury did not award duplicative damages.

---

[10] The elements of a goods and services received cause of action are: "1. That [name of defendant] requested, by words or conduct, that [name of plaintiff] [perform services/deliver goods] for the benefit of [name of defendant]; [¶] 2. That [name of plaintiff] [performed the services/delivered the goods] as requested; [¶] 3. That [name of defendant] has not paid [name of plaintiff] for the [services/goods]; and [¶] 4. The reasonable value of the [goods/services] that were provided." (CACI No. 371.)

[11] The elements of an open book account cause of action are: "1. That [name of plaintiff] and [name of defendant] had (a) financial transaction(s); [¶] 2. That [name of plaintiff] kept an account of the debits and credits involved in the transaction(s); [¶] 3. That [name of defendant] owes [name of plaintiff] money on the account; and [¶] 4. The amount of money that [name of defendant] owes [name of plaintiff]." (CACI No. 372.)

14

**C.      The court did not prejudice Appellants by not admitting the verified complaint**

We review evidentiary rulings for abuse of discretion. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.)

Appellants argue the trial court erred in failing to admit Skorick's original verified complaint because the complaint impeached Skorick. According to Appellants, Skorick's operative FAC and his position at trial were incompatible with his original complaint. In the original complaint, Skorick (1) asserted he had an interest in the property based on the original agreement but (2) did not assert he and Appellants entered into a subsequent oral modification whereby he relinquished his interest in the property. In his FAC and at trial, however, Appellants contend Skorick claimed he had an interest in the property and relinquished it through a modification to the original agreement. Appellants argue that if the court had admitted the original complaint, they could have impeached Skorick by showing that he had proposed fundamentally conflicting positions: First by filing for an interest in the property and never mentioning the existence of a subsequent oral modification and then by arguing the parties had modified the agreement and he had given up his interests.

At trial, however, the court permitted Appellants' counsel to cross-examine Skorick about the allegations made in the complaint. According to the judge, the pleadings, in terms of the legal theories and causes of action, were not proper to bring before the jury because they represented counsel's trial strategy, not the factual substance of Skorick's allegations. The judge reasoned that it would confuse the jury to present it with the original complaint, only to explain that while it was not to consider the lawyers' legal strategies in the form of theories or causes of action, it could consider the factual allegations.

We uphold Skorick's award for two reasons. First, Appellants provided no case law requiring that a court must admit a verified pleading in writing and present it to a jury in order to satisfy the opposing party's right to impeach a witness on the facts. Second, even if the court could have admitted the pleading and given a limiting instruction,

15

Appellants presented no convincing argument the result of the trial would have been different.  Appellants had the opportunity to demonstrate to the jury through cross-examination that Skorick had not originally alleged the oral modification and then argue at closing that Skorick fabricated the modification only later as a matter of convenience as a way to overcome a statute of frauds issue.  In absence of demonstrable prejudice or error, we will not reverse the court's refusal to admit the verified complaint.  (Cal. Const., art. VI, § 13.)

## DISPOSITION

The judgment is affirmed.  Skorick is awarded his costs on appeal under California Rules of Court, rule 8.278.

NOT TO BE PUBLISHED.


LUI, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

16