Filed 5/23/25  In re N.A. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.A., a Person Coming Under the Juvenile Court Law. | D084886 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1319E) |
| v. | ORDER MODIFYING OPINION |
| N.A. et al., | NO CHANGE IN JUDGMENT |
| Defendants and Appellants. | |

THE COURT:

It is ordered that the opinion filed on May 22, 2025, be modified as follows:

On page 1, the counsel listing for Defendant and Appellant, N.R. is replaced with the following:

"William D. Caldwell, under appointment by the Court of Appeal, for Plaintiff and Respondent, N.R."

There is no change in the judgment.

O'ROUKE, Acting P. J.

Copies to:  All parties

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.A., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D084886 |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1319E) |
| v. | |
| N.A. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Daniela Reali-Ferrari, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant, N.A.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant, L.B.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant, N.R.

Mansi Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant, Jessica C. (De Facto Parent).

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy Counsel, Indra N. Bennett, Deputy County Counsel, for Plaintiff and Respondent.

To say this case has a complicated procedural history would be an understatement. It serves as a stark reminder of the difficult task often faced by the juvenile court in making decisions that affect the relationships of persons in the dependency system, including between a parent and a dependent child, the child and his or her siblings, and the child and his or her foster family, as well as the quality of their lives to follow.

When a child is removed from a parent's custody at the final stage of reunification, Welfare and Institutions Code[1] section 366.22, subdivision (a)(1) requires the juvenile court to "order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to the parent or guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

In this case, dependent child N.A. (born 2021) (Minor) and nondependent sibling L.B. (2015) each filed a petition under section 388 in advance of the repeatedly continued, contested 18-month review hearing (Contested Hearing). Minor filed her petition about a month before the start of the Contested Hearing, about 34 months after her removal. She asked the juvenile court (1) to maintain or limit visitation between Minor and her natural parent N.R. (Mother) and not to expand overnights as proposed by

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

the San Diego County Health and Human Services Agency (Agency); (2) to keep Minor's service providers in Ventura County, where she lived with L.B. and his adoptive parents, who were Minor's foster parents; and (3) to refrain from introducing Minor to new service providers in San Diego County, where Mother lived and received services.

L.B. brought his (sibling) petition under section 388, subdivision (b)(1). He sought (1) to change the juvenile court's order granting Mother reunification services, including a 60-day trial visit with Minor; and (2) permanent placement of Minor in his adoptive home.[2]

The juvenile court found Minor and L.B. made prima facie showings on their respective petitions and ruled that evidence of Minor's bond with her foster family would not be considered at the Contested Hearing. At the parties' request, the court conducted a document trial. The parties stipulated to the admission of more than 700 pages of documents, including expert reports prepared on Minor's behalf. The court allowed L.B. to participate in the Contested Hearing, but trailed his section 388 petition. After extensive argument by counsel, on September 17, 2024, the court made a no-detriment finding by a preponderance of the evidence, ordered Minor returned to Mother's custody, and denied the petitions of Minor and L.B.

On appeal, Minor argues the juvenile court denied her due process of law at the Contested Hearing when it allegedly refused to hear her petition and allegedly deprived her of the ability to present evidence. She claims this evidence went to her best interest under section 388 and supported a finding she would suffer irreparable harm if the court severed the bond between her and her foster family. L.B. likewise argues the court denied him due process

_____

2    De facto parent Jessica C. also filed her own section 388 petition on the same day as L.B. but withdrew it before the Contested Hearing.

3

of law including by trailing, and ultimately dismissing, his petition. De facto parent Jessica C. also appealed, joining the arguments of Minor and L.B. in their opening briefs.

The Agency makes a series of arguments in response, including: (1) as a threshold matter, Jessica C. lacks standing to appeal from the order returning Minor to Mother's custody; (2) the court did not violate Minor's due process rights because the issue at the Contested Hearing was not whether Minor would suffer detriment if "removed" from her foster family, but rather whether she could safely "return" to Mother's custody as set forth in section 366.22; and the court, in any event, considered the evidence in support of Minor's petition; and (3) L.B., as a nondependent sibling seeking permanent placement of Minor, received the process he was due when the court allowed him to participate in the Contested Hearing but limited the evidence he could present.

As we explain, we independently conclude (1) Jessica C., as a de facto parent, lacks standing on appeal; and (2) the juvenile court deprived neither Minor nor L.B. of due process of law. Accordingly, we affirm the juvenile court's order returning Minor to Mother's physical custody and dismissing the section 388 petitions of Minor and L.B.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. *The Petition, Detention, and Reinstatement of Mother's Services*

In October 2021, the Agency filed a petition alleging Minor was a person described by section 300, subdivision (b)(1), after she and Mother tested positive for amphetamine and methamphetamine. The petition also

---

[3] We summarize the facts in the record in the light most favorable to the respondent and the September 17, 2024 order. (See *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329.)

alleged Mother and presumed father I.A. (Father)[4] had an "extensive history of domestic violence" and had several other children involved in prior dependency proceedings, including L.B. Mother and Father were both homeless at the time and, according to Mother, had planned Minor's pregnancy. The juvenile court ordered Minor detained in the Ventura County home of Jessica C., where nondependent sibling L.B. resided with his adoptive family.

At the jurisdiction/disposition hearing, the juvenile court made a true finding on the petition and ordered Minor to remain placed with Jessica C. In July 2022, the court terminated Mother's reunification services and set the matter for permanent placement.

In its section 366.26 report, the Agency recommended termination of parental rights. Mother responded by filing a section 388 petition seeking reinstatement of reunification services. She claimed she had been in custody for a minor infraction when the order was issued and in inpatient residential treatment, where she had remained clean and sober for six months. The Agency opposed Mother's petition.

The juvenile court made a prima facie finding on Mother's petition and set the matter for an evidentiary hearing. The court subsequently vacated the order setting the section 366.26 hearing and reinstated Mother's reunification services, finding she had met her burden of proof by a preponderance of the evidence to show changed circumstances and best interests of Minor.

---

[4] Father first appeared in the case on the eve of the Contested Hearing, did not meaningfully participate in that proceeding, and is not a party in this appeal.

**B.** *Initial 18-month Review Hearing*

At the continued section 366.22 hearing held in November 2023, the juvenile court found (1) the Agency did not meet its burden to show it provided reasonable reunification services to Mother, as an Agency social worker who specialized in adoptions had been overseeing her services once they were restored; (2) "overwhelming evidence" Mother had ameliorated the "original protective issue"; but (3) it would then be detrimental to Minor's "emotional well[-]being" to return her to Mother's custody given their "limited relationship." The court continued the 18-month review hearing for six months to afford Mother additional reunification services, including structured unsupervised visits with Minor.

**C.** *The Section 388 Petitions of L.B. and Jessica C.*

In March 2024, nine-year-old L.B.—then appearing in propria persona—and his mother Jessica C. each filed a section 388 petition on the same day. L.B.'s section 388 petition challenged the juvenile court's March 2023 order extending Mother's reunification services and giving the Agency discretion to place Minor with Mother for a 60-day trial visit. L.B. requested that Minor remain in the care of her foster family so they could "grow up" together. Thereafter, Minor's counsel, who had supported the plan for extended visitation toward a 60-day trial visit, declared a conflict of interest and withdrew from the case.

Jessica C.'s section 388 petition also asked the juvenile court to vacate the March 2023 order and hold a full evidentiary hearing under section 366.22 to determine whether placement of Minor with Mother would be "detrimental." In support of her petition, Jessica C. alleged Minor had undergone significant behavioral changes as a result of her increased visits with Mother, including self-injurious behavior.

6

At a hearing in late April 2024, Minor's new counsel expressed "grave[ ] concerns" about the Agency's plan to expand Mother's visitation beyond a single overnight. Minor also argued L.B. had standing to intervene in the case and had made a prima facie showing warranting an evidentiary hearing on his section 388 petition. Jessica C. asked the court to appoint counsel for L.B. to allow his "voice to be heard."

The juvenile court declined to make any changes to visitation, noting Minor's visits with Mother were "going very well." The court ruled the Agency would continue to have discretion to expand visitation, including up to a 60-day trial visit with the concurrence of Minor's counsel. It deferred ruling on the petitions of L.B. and Jessica C., and recognized L.B.'s petition was brought as a sibling to a dependent child under section 388, subdivision (b)(1).[5]

D. *The Agency's Updated Report and L.B.'s Prima Facie Showing*

In its May 2024 status review report, the Agency recommended the juvenile court return Minor to Mother's custody and provide family maintenance services. The report noted Mother met all of her case plan goals; completed her court-ordered services; was employed, financially stable, and residing in a sober-living home with "ample" support where Minor also

---

[5] Section 388, subdivision (b)(1) provides: "Any person, including a child or a nonminor dependent who is a dependent of the juvenile court, may petition the court to assert a relationship as a sibling . . . to a child who is, or is the subject of a petition for adjudication as, a dependent of the juvenile court, and may request visitation with the dependent child, placement with or near the dependent child, or consideration when determining or implementing a case plan or permanent plan for the dependent child or make any other request for an order which may be shown to be in the best interest of the dependent child."

7

could live; and maintained her sobriety, regularly attending NA/AA meetings and working closely with a sponsor.

During the reporting period, the Agency observed several visits between Mother and Minor, including during and after overnights, with no concerns reported. It noted Mother traveled by train most weekends to Ventura County to visit Minor; and observed the child to be "comfortable and happy" in Mother's care.

At the May 6 hearing, Jessica C. withdrew her section 388 petition. She spoke on L.B.'s behalf, noting he was "heartbroken over the idea of losing his sister," argued he had the right to intervene in the case under section 388, subdivision (b)(1), and again asked the juvenile court to appoint him counsel.

The juvenile court found L.B. made a prima facie showing on his petition, but remained uncertain whether he and/or Jessica C. had standing to participate in the upcoming Contested Hearing.

Toward the end of the hearing, Minor asked the juvenile court to limit Mother's visitation to two overnights a week. The Agency opposed that request. The court again declined to change its visitation order, finding the Agency had discretion to expand visitation; and commented it was "happy" to learn that Mother was having two overnights each week. At a hearing later that month, Jessica C. informed the court that the family would retain private counsel for L.B.[6]

At the June status conference hearing, the juvenile court declined the Agency's request to modify the visitation order to allow Mother a 60-day trial visit without Minor's counsel's concurrence. Minor's counsel opposed lifting

---

[6] The juvenile court attempted to appoint L.B. counsel, but Children's Legal Services and the Office of Assigned Counsel each declined the representation due to the terms of their respective contracts, given L.B.'s sibling relationship with Minor and the timing of his request.

8

the concurrence requirement, noting Minor's due process rights allegedly were at stake if placed with Mother for 60 days.

## E. *Standing*

At a July hearing, the parties debated whether Jessica C. and/or L.B. had standing to participate at the Contested Hearing. As relevant here, the Agency and Mother argued L.B.'s standing under section 388, subdivision (b)(1) was "limited" because the Legislature could not have intended to allow a nondependent sibling to advocate for termination of reunification services for a dependent-child parent, frustrating the goal of family reunification during this stage of dependency.

The juvenile court ruled L.B. could introduce evidence at the Contested Hearing regarding his relationship with Minor if it "relate[d] to the ultimate issue of detriment," subject to any objections including on the grounds of relevancy and undue consumption of time.

## F. *Minor's Section 388 Petition*

Within weeks of the Contested Hearing, Minor filed a section 388 petition asking the juvenile court to change its March 2023 order giving the Agency discretion to expand overnights with Mother. Specifically, Minor's petition asked the court (1) to require Minor's counsel's concurrence before allowing the Agency to further expand visitation; and (2) to prevent the Agency from introducing Minor to new service providers in San Diego County and instead maintain the status quo with her providers in Ventura County.

The Agency opposed Minor's petition, noting Minor sought to limit Mother's visitation at "every" hearing. The Agency argued that, until the juvenile court terminated Mother's reunification services, the law required the Agency to ensure Mother had adequate visitation as part of its effort to

9

reunify the family; and failure to ensure adequate visitation with Minor could result in another finding of lack of reasonable services to Mother.

The Agency also argued that Minor needed service providers in San Diego County, as Minor's request to have providers only in Ventura County was tantamount to "denying reunification"; that for the Agency to offer services to Minor in San Diego County, visitation with Mother needed to increase to four overnights a week; and that the court should deny prima facie on Minor's petition because it raised the same issues that would be addressed at the Contested Hearing. The Agency acknowledged Minor acted out when she transitioned between her foster family and Mother, but indicated that once visitation with Mother began, there were no reported issues and visitation went well.

The juvenile court deferred ruling on whether Minor made a prima facie showing. In so doing, the court commented Minor was making the same request she had "made multiple times in numerous hearings where the court reiterated . . . it was not prepared to change the Agency's discretion to expand visits."

## G. *The Court's Interim Order*

At the August pretrial conference hearing, the Agency asked the juvenile court to add one more overnight to Mother's visitation schedule, bringing the total to five overnights a week in San Diego County. Minor objected and requested the court make a prima facie finding on her petition, arguing if the court granted the Agency's request it was effectively returning her to Mother's custody before the Contested Hearing.

Minor further argued the attachments to her petition, including from a neuropsychologist specializing in trauma and psychology, confirmed the dysregulation she experienced during transitions between her foster family

10

and Mother and from increased visits with Mother; her trauma would only increase if she were introduced to new service providers in San Diego County; and if the court expanded Mother's visitation as proposed by the Agency, she would end up in daycare several days a week "instead of spending that [time] with her family." Minor claimed her petition did not seek to stop visitation, but merely "to slow it down to allow her to adjust."

The Agency argued the juvenile court should deny prima facie on Minor's petition, explaining Mother's visits were going "fine"; the Agency social worker who transported Minor between Ventura County and San Diego County had no concerns; and none were noted by the child's other service providers or the residents of Mother's sober-living home who observed Minor and Mother together.

Mother argued the neuropsychologist's report was not trustworthy because it was based on a series of videos taken by Jessica C. during transitions between the foster parents and Mother; that none of the videos showed Mother and Minor together, despite the neuropsychologist's conclusion that no "bond" allegedly existed between them; and that the neuropsychologist had never met Minor or Mother. Mother represented she then had no intention of introducing Minor to new providers, and she and Minor had a developmental screening and enhancement program (DSEP) specialist from Rady Children's Hospital who reported no concerns based on the same information relied on by the neuropsychologist.

The juvenile court found Minor made a prima facie showing on her petition, issued an interim order that visitation between Mother and Minor was not to increase, and stated it would conduct the section 366.22 hearing first and then decide the section 388 petitions.

11

**H. *Contested Hearing***

The section 366.22 hearing commenced in late August. At the outset, Minor asked the juvenile court to clarify the "scope of information in determining detriment." The court responded, "[M]y ruling is clear. If the basis for this person's testimony is that they see the detriment because of severing the bond, or the relationship, or however you want to call it from the caregivers, if that is the basis that they are relying on, this court's view is it would be impermissible for the fact finder to consider that." After hearing additional argument, the court reiterated that "[e]vidence of bonding with the foster family at this point of the proceedings—we are in reunification—in this court's view, that is not something the court should consider."

After a brief recess, the parties settled on a documents-only trial. Other than two exhibits—the resume and accompanying letter of the family therapist for the foster family, counsel stipulated to the admission of the exhibits on the joint exhibit list, which included the reports of Minor's experts.

### 1. Document Trial and Argument

The parties provided the juvenile court with over 700 pages of documents as well as video evidence. The court indicated it would entertain testimony as well, if deemed necessary by the parties. Given the stipulation of the parties to admit the exhibits, the Agency rested but indicated its social worker was available for cross-examination.

The juvenile court admitted the exhibits into evidence, including Minor's section 388 petition and accompanying reports, as well as other evidence to show detriment; took judicial notice of the section 388 petitions of Jessica C. (which it recognized had been withdrawn) and L.B.; and trailed L.B.'s petition.

12

The Agency argued for a no-detriment finding, noting there was no evidence Mother was unsafe with Minor. To the contrary, it noted the evidence was "exceptionally clear" that Mother was doing "great" caring for Minor, as also confirmed by the DSEP specialist at Rady Children's Hospital; and in a report prepared in August 2024 by a psychologist who conducted a bonding study. Through personal observation on two occasions, the psychologist found Mother and Minor engaged in "healthy parent-child exchanges" that were "positive, reciprocal, and appropriate"; and Minor sought out and "welcome[d] Mother's company" and was "relaxed" in her care. Regarding Minor's evidence, the Agency noted it would be pertinent at a section 366.26 hearing, when a dependent child's need for stability is the focus, but evidence of Minor's bond with her foster family was not relevant at the Contested Hearing, where the focus is on family reunification.

Mother noted the many obstacles she faced during the dependency, including appointment of an Agency adoption social worker who had failed to provide Mother with reasonable reunification services, communicated directly with Jessica C., and advocated against reunification. Mother pointed out the concerns expressed by Jessica C., as shown in the videos, were not observed by independent third parties including Agency social workers who transported Minor for visits. Mother recommended the court review Minor's therapy notes from a March 2024 appointment in Ventura County in which the therapist stated Jessica C. was "seeking medical documentation that demonstrate[d] a correlation between [Minor's] behavioral challenges and the increase in visitation with [Mother]."

Mother argued Jessica C. had "attempted to thwart reunification with exponentially pervasive interference at every stage of this case."[7] For example, Jessica C. refused to use a "shared backpack" containing photographs and other items, as recommended by the DSEP specialist, to alleviate some of Minor's anxiety during transitions; spoke negatively about Mother to Minor; and reinforced and perpetuated Minor's behaviors during transitions, against the advice of professionals, by giving the child more instead of less attention.

Mother also argued the juvenile court should give the neuropsychologist's report little to no weight because she had never met or interacted with Minor in person, instead relying on "subjective impressions" provided by Jessica C.

Mother also discounted an August 2024 report by a psychotherapist retained by Minor who observed a virtual visit between Mother and Minor. The psychotherapist concluded Minor was "emotionally detached" during the call; and, in reliance on the videos taken by Jessica C., opined overnights were "emotionally harmful" to Minor and causing her "toxic stress" that would "have lifelong effects on her developing brain." Like the neuropsychologist, Mother noted the psychotherapist had had no in-person observation of Minor and Mother together and had ignored evidence of the positive attachment between them.

Minor sought to remain in the placement with her foster family and to terminate Mother's reunification services. She highlighted the reports of her primary care physician, therapist, and neuropsychologist to support her claim

---

[7] Jessica C. denied the Mother's allegations and argued the juvenile court should terminate reunification services and set a section 366.26 hearing for permanent placement.

14

the dependency system had "failed" her in this case. Minor noted the neuropsychologist recommended suspending Mother's unsupervised visits and instituting supervised visits in Ventura County to reduce the "profound fear and confusion" she experienced in Mother's care. According to the neuropsychologist, the court should maintain Minor's placement with her foster family to prevent the potential "lifelong effects" on her developing brain.

L.B. argued the juvenile court erred when it excluded evidence of the sibling bond between him and Minor to show severance of that relationship would be detrimental if Minor was returned to Mother's custody; and when it decided to trail his section 388 petition. He requested the court continue Minor's placement with his adoptive family.

### 2. The Ruling

The juvenile court noted the Agency's position for months was to recommend returning Minor to Mother's custody, as the Agency exercised its discretion to gradually expand visitation; Minor's counsel refused to give consent to a 60-day trial visit with Mother and had "repeatedly requested this court halt any expansion of visitation[ ]"; and the Agency in response unsuccessfully sought a change to the order requiring consent. The court further noted Minor "aligned" with Jessica C. in requesting that Minor remain in the care of her foster family, contending visits with Mother caused Minor's dysregulation and evidenced detriment. The court explained it had reviewed all of the expert reports submitted by Minor, including from the neuropsychologist.

The juvenile court found the neuropsychologist's report to be "less [than] persuasive" in that the neuropsychologist did not view a single in-person interaction between Minor and Mother, instead basing her opinions on

15

videos and reports provided by Jessica C. The court reached the same conclusion regarding the psychotherapist's report, which concluded that overnight visitation between Mother and Minor was "emotionally harmful" and recommended prioritizing permanent stability in the foster home, discontinuing overnight visitation, and pursuing an "open adoption." The court also considered the report from Minor's primary care physician, and found evidence of Minor's dysregulation in doctor notes that predated Mother's unsupervised visits with the child.

The juvenile court questioned the "veracity as well as the bias" of Jessica C. in connection with the information she provided Minor's experts regarding the child's dysregulation. The court found Jessica C. had "altered" Minor's preschool records, knowing they would be used at the Contested Hearing. The court also referenced the text messages between Jessica C. and an Agency social worker that showed the foster parents "were very hopeful that reunification would not occur."

Conversely, the juvenile court found no evidence that Minor's dysregulation was solely due to visits with Mother or that Mother was not equipped to manage these behaviors. The court found Mother had "far exceeded the terms of her case plan" prepared by the Agency; and that independent observers—including Agency social workers—had dropped in unannounced during overnight visits and found Minor to be "happy," "calm," and "in good spirits," without any reports of dysregulation or a child in distress. The DSEP specialist, who had recently worked with Mother and Minor and previously had participated in "multiple sessions" with them, also did not report concerns. Neither did Minor's court-appointed special advocate, who observed a visit at Mother's home and found Minor to be "very happy" and "talkative" and Mother to be "attentive" to the child's needs.

16

Based on the voluminous evidence, the juvenile court "simply" could "not find by a preponderance of the evidence that returning [Minor] to the custody of her mother would result in a substantial risk of detriment to her physical or emotional well[-]being."  The court ordered Minor returned to Mother's custody under family maintenance and denied the section 388 petitions of Minor and L.B.  The court included sibling visitation as part of its order.

## DISCUSSION

## I.

## <u>Jessica C. and Standing</u>

As a threshold issue, the Agency argues Jessica C. lacks standing to appeal.  We agree.

### A. *Guiding Principles*

"The right to appeal is purely statutory." (*Jennifer T. v. Superior Court* (2007) 159 Cal.App.4th 254, 260.)  Code of Civil Procedure section 902 provides in part, "Any party *aggrieved* may appeal in the cases prescribed in this title." (Code Civ. Proc., § 902, italics added.)  "The test is twofold—one must be both a party of record to the action and aggrieved to have standing to appeal." (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1342.)  Thus, notwithstanding an appealable judgment or order, "[a]n appeal may be taken only by a party who has standing to appeal.  [Citation.]  This rule is jurisdictional." (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947 (*Sabi*).)

"One is considered 'aggrieved' whose rights or interests are injuriously affected by the judgment." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 (*Carleson*).)  "Conversely, '[a] party who is not aggrieved by an order or judgment has no standing to attack it on appeal.' " (*Conservatorship of Gregory D.* (2013) 214 Cal.App.4th 62, 67 (*Gregory D.*); accord, *Sabi, supra*,

183 Cal.App.4th at p. 947 [respondents lacked standing to file a cross-appeal because they "completely prevailed" in the trial court].) These rules of appellate procedure apply to appeals from dependency proceedings. (*In re J.B.* (2025) 109 Cal.App.5th 133, 139 (*J.B.*).)

"De facto parent status does not give the de facto parent the right to reunification services, visitation, custody, *or placement of the minor*, 'or to any degree of independent control over the child's destiny whatsoever.' [Citations.] De facto parent status 'merely provides a way for the de facto parent to stay involved in the dependency process and provide information to the court.' " (*In re B.S.* (2021) 65 Cal.App.5th 888, 895 (*B.S.*), italics added.)

## B. *Analysis*

*J.B.*, decided by Division Two of our court, provides meaningful guidance on the present issue. There, the dependent child had been in the care of the de facto parent for about two years. The parents filed petitions under section 388 seeking additional reunification services and increased visitation. The de facto parent, who sought to adopt the child, opposed the petitions. The juvenile court granted the parents' petitions and the de facto parent appealed from that order. (*J.B., supra*, 109 Cal.App.5th at p. 135.)

The *J.B.* court dismissed the de facto parent's appeal, concluding she lacked standing because the order did not injuriously affect her rights and interests "in an immediate and substantial way." (*J.B., supra*, 108 Cal.App.5th at p. 139.) " 'While de facto parents may *feel* aggrieved and, no doubt, may be *emotionally* affected by court orders affecting the custody of a minor, a de facto parent has no standing to appeal a custody decision because they cannot show how their *legal* rights were injuriously affected.' " (*Id.* at p. 140, quoting *B.S., supra*, 65 Cal.App.5th at p. 897.)

18

In reaching its decision, *J.B.* relied on *In re P.L.* (2005) 134 Cal.App.4th 1357 (*P.L.*), a case also decided by Division Two of our court. In *P.L.*, the de facto parent appealed from an order removing the dependent child, who had been in her care for about two years, and placing the child in a prospective adoptive home. (*Id.* at pp. 1359–1360.) In dismissing the de facto parent's appeal, the *P.L.* court concluded, "[A]ppellant has no legal standing to complain of the decision to place the child with the new prospective couple since she has no right to custody or continued placement as a mere de facto parent. The order changing physical custody was within the sound discretion of the court from which appellant cannot appeal because her legal rights were not impacted." (*Id.* at pp. 1361–1362.)

*J.B.* noted a majority of the Second District Court of Appeal in *In re Vincent M.* (2008) 161 Cal.App.4th 943 (*Vincent M.*) reached a different conclusion. In that case, the mother had surrendered the dependent child while the father was unknown. The juvenile court set a section 366.26 hearing with the permanent plan of adoption, placed the child in foster care, and granted the foster parents de facto status. Several months later, the father came forward, filed a section 388 petition requesting presumed father status and seeking reunification services. The court granted the petition and the de facto parents appealed. (*Vincent M.,* at pp. 949–950.)

The majority in *Vincent M.* rejected the father's argument the de facto parents lacked standing to appeal because they had no right to custody or placement of the dependent child. (*Vincent M., supra*, 161 Cal.App.4th at p. 952.) The majority concluded the de facto parents' rights and interests were injuriously affected by the juvenile court's ruling because it took the case "off the adoption track." (*Id.* at p. 953.)

19

The dissent in *Vincent M.* disagreed. (*Vincent M., supra*, 161 Cal.App.4th at p. 961 (dis. opn. of Armstrong, J.).) It noted the de facto parents undoubtedly suffered "emotional pain" and felt aggrieved, but they lacked standing because they had no legal right to adopt the child during that stage of dependency. (*Id.* at pp. 962–964 (dis. opn. of Armstrong, J.).)

The *J.B.* court also looked to the Third District's decision in *B.S.* for guidance. (*J.B., supra*, 109 Cal.App.5th at p. 140.) In *B.S.*, the de facto parents appealed from the order removing the child from their care and placing her with maternal relatives. (*B.S., supra*, 65 Cal.App.5th at p. 891.) The *B.S.* court examined *P.L.* and *Vincent M.* and concluded *P.L.* was better decided. (*Id.* at p. 897.) The *B.S.* court recognized a de facto parent does not have the same rights as a biological parent, and such status " 'provides a way for the de facto parent to stay involved in the dependency process and provide information to the court,' " but it does not give the de facto parent " 'any degree of independent control over the child's destiny whatsoever.' " (*Id.* at p. 895.)

We agree with the decisions in *J.B.*, *P.L.*, *B.S.*, and the dissent in *Vincent M.* Undoubtedly, Jessica C. has been emotionally affected by the order returning Minor to Mother's custody, and understandably feels aggrieved by that ruling because it disrupted the de facto parents' plan to adopt Minor, as they had done with sibling L.B. (See *J.B., supra*, 109 Cal.App.5th at p. 140; *P.L., supra*, 134 Cal.App.4th at pp. 1361–1362; *B.S., supra*, 65 Cal.App.5th at p. 897.) But at the reunification stage of dependency, we conclude Jessica C.'s legal rights were not "injuriously affected" because she had no legal right to keep Minor in her care. (See *Carleson, supra*, 5 Cal.3d at p. 737; accord, *Gregory D., supra*, 214 Cal.App.4th at p. 67; see also § 396 [providing in part, "It is the policy of

20

the Legislature that foster care should be a temporary method of care for the children of this state."].)

Accordingly, we must dismiss Jessica C.'s appeal on jurisdictional grounds because, as a de facto parent, she lacked standing to appeal from the September 17, 2024 order returning Minor to Mother's custody.  (See *Sabi, supra*, 183 Cal.App.4th at p. 947.)

## II.

### <u>Dependency and Due Process</u>

Minor argues the juvenile court denied her due process of law by refusing to allow her to present additional evidence of her best interest at the Contested Hearing.  L.B. similarly argues he was denied due process, including as a result of the court's decision to trail his petition.  We reject these claims of error.

## A.  *Guiding Principles*

### 1.  **Due Process and the Standard of Review**

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " (*Mathews v. Eldridge* (1976) 424 U.S. 319, 333.)  In a dependency case, "due process focuses on the right to notice and the right to be heard." (*In re Matthew P.* (1999) 71 Cal.App.4th 841, 851; accord *In re Armando L.* (2016) 1 Cal.App.5th 606, 620–621; see also Cal. Rules of Court, rule 5.534(g)(1)(D)[8] [court must advise child, parent, or guardian of the right to present evidence to the court].)

The right to present evidence, however, is not unlimited.  "The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court." (*In re Jeanette V.* (1998)

---

[8]    All further rule references are to the California Rules of Court.

21

68 Cal.App.4th 811, 817 (*Jeanette V.*); Evid. Code, § 210 ["Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact of consequence to the determination of an action."].) In addition, a juvenile court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion, or consumption of time. (Evid. Code, § 352.)

"Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; *In re Cole C.* (2009) 174 Cal.App.4th 900, 911 [a juvenile court's ruling on the admissibility of evidence will only be disturbed if there is a clear showing of an abuse of discretion].)

### 2. Reunification and Visitation

Our dependency law seeks to balance a number of interests: "[C]hildren's interests in safe and stable homes; parents' interests in raising their children; families' shared interests in each other's companionship; and the state's interest in protecting society's most vulnerable members. . . . [¶] Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 623–624 (*Michael G.*).)

This case concerns reunification. After removal, with certain exceptions not relevant here, the juvenile court "must order child welfare services designed to facilitate the reunification of the family. [Citations.] Such services may, depending on the case, include evaluations and assessments, counseling, parent education, substance abuse treatment and

22

testing, and other forms of assistance. ' "Reunification services," ' we have explained, ' "implement 'the law's strong preference for maintaining the family relationships if at all possible.' " ' [Citation.] This is because 'services enable [parents] to demonstrate parental fitness and so regain custody of their dependent children.' " (*Michael G., supra*, 14 Cal.5th at p. 624.)

As the Supreme Court explained in *In re Marilyn H.* (1993) 5 Cal.4th 295, 308, "At the dispositional hearing, and at each review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody. . . . At 6-, 12-, and 18-month review hearings the juvenile court must return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being."

The detriment standard in section 366.22, subdivision (a)(1), "while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789 (*David B.*).)

"Visitation is an essential component of any reunification plan." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972 (*Alvin R.*).) "To promote reunification, visitation must be as frequent as possible." (*Ibid.*; rule 5.695(f)(3) ["If a child is removed from the custody of a parent or guardian, and reunification services are ordered, the court must order visitation between the child and the parent or guardian for whom services are ordered. Visits are to be as frequent as possible, consistent with the well-being of the child."].) Failure to allow visitation, including up to a 60-day

trial visit, can result in reversible error if a parent is denied the "full benefit" of reunification. (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 508 (*Rita L.*).) "[T]he law is clear that reasonable services, most particularly visitation, must be provided." (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1791 (*Elizabeth R.*) [concluding the failure of the social service agency to arrange for visitation following the 18-month period would constitute sufficient grounds to conclude the services provided a parent, who had been incarcerated during the final six months of reunification, were unreasonable].)

The case of *Rita L.* informs our analysis in this case on two fronts. First, *Rita L.* concluded the juvenile court erred when it considered the quality of the relationship between the dependent child and his de facto parents in terminating the mother's reunification services and setting the case for permanent planning under section 366.26. (*Rita L., supra*, 128 Cal.App.4th at pp. 498, 507.) In reversing, *Rita L.* noted it was certainly "understandable" the court would be concerned about the child's future and attachment to his de facto parents, but concluded "that consideration is simply not pertinent to the determination of whether [the mother's] reunification period should be extended." (*Id.* at p. 507.) *Rita L.* observed the court "jumped the gun a bit" when it considered the child's relationship with his de facto parents "as *part of* its decision to terminate services" (*ibid.*); noted "[i]t is only after the court terminates services and orders a hearing pursuant to section 366.26, that attention turns to assessing the quality of the child's relationships with his or her . . . prospective adoptive parents" (*ibid.*); and "caution[ed] the juvenile court against allowing such an impression to take hold" (*id.* at p. 508).

Second, as a separate and independent basis to reverse the order, *Rita L.* concluded the juvenile court erred when it precluded the social services agency from proceeding with the mother's 60-day trial visit. (*Rita L., supra*, 128 Cal.App.4th at p. 508.) The court noted the agency, through no fault of its own, was attempting "to carry out the mandate of making visitation 'as frequent as possible' " when its efforts were stymied by multiple continuances of the review hearing and by the child's counsel, who filed an ex parte motion to prevent the trial visit from commencing, which the court effectively granted "by temporizing indefinitely." (*Id.* at p. 509.) In so doing, *Rita L.* concluded the reunification services offered to the mother were unreasonable. (*Ibid.*)

## B. *Analysis*

We conclude the juvenile court afforded Minor and L.B. the process each was due.

### 1. Minor's Petition

First, the record shows the juvenile court granted in substantial part the relief Minor sought in her petition when it refused to allow the Agency to expand Minor's visitation to include a 60-day trial visit *without* the concurrence of Minor's counsel, and when it limited the Agency's discretion both to include an additional overnight and begin provider services for Minor in San Diego County. Thus, in advance of the Contested Hearing Minor obtained much, if not all, of the relief she sought in her section 388 petition.

Second, contrary to her due process claim, the record also shows the juvenile court carefully considered Minor's evidence during the Contested Hearing, including the reports of the neuropsychologist and the psychotherapist. It found both reports to be less credible than the bonding-study report prepared by Mother's expert because unlike Mother's expert,

25

neither the neuropsychologist nor the psychotherapist met Minor and/or Mother in person, instead relying on information and videos provided by Jessica C. (*In re Caden C.* (2021) 11 Cal.5th 614, 640 [as a court of review, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts,' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists].) The court noted it shared the same concern as Mother's bonding expert regarding the reliability of experts who based their opinions solely on information provided by those who have a "major stake" in the outcome.

Third, the evidence considered by the juvenile court was arguably beyond what due process required, considering the goal of reunification at a section 366.22 review hearing. Minor's evidence called for the Agency to stop Mother's unsupervised visitation at this late stage of reunification, well past the 18-month period, and begin supervised visitation in Ventura County with a de facto parent present (neuropsychiatrist's recommendation), or to terminate Mother's reunification services altogether and set a permanent plan of adoption of Minor (psychotherapist's recommendation). These reports were not based on evidence that Mother could not safely care for Minor if she was *returned* to Mother's custody, but rather the harm Minor might suffer if *removed* from her foster family. (See *Jeanette V., supra*, 68 Cal.App.4th at p. 817 [no due process right to present irrelevant or marginally relevant evidence].) This conclusion is reinforced by Minor's counsel's claims at the Contested Hearing that the dependency system allegedly had "failed" Minor; and that Minor was better off in the care of her foster family, who stayed home with Minor, than with Mother, who needed childcare when she was at work.

26

But as *Rita L.* explained, evidence of the bond between the dependent child and his or her foster family, and the related adjustment for both when the child is removed and safely returned to the custody of a parent or guardian, are not relevant at the section 366.22 hearing.  Rather, the focus is squarely on family reunification and whether the parent or guardian can safely care for the child.  (*Rita L., supra*, 128 Cal.App.4th at pp. 507–508; accord, *In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1281 ["The purpose of . . . reunification services is 'to facilitate the return of a dependent child to parental custody.' "]; *David B., supra*, 123 Cal.App.4th at p. 788 [whether a dependent child feels "bonded" to a parent "is simply not the relevant inquiry" during reunification; "[u]ntil services are terminated, reunification is the goal and [the parent] is entitled to every presumption in favor of having [the child] released to his [or her] custody"]; *Elizabeth R., supra*, 35 Cal.App.4th at p. 1778 [" 'The focus during the prepermanent planning stages is preserving the family whenever possible [citation] whereas the focus after the permanent planning hearing is to provide the dependent children with stable, permanent homes.' "]; *In re Rebecca H.* (1991) 227 Cal.App.3d 825, 843 [reunification services implement "the law's strong preference for maintaining the family relationships if at all possible"].)

Fourth, although Minor's section 388 petition ostensibly addressed not expanding Mother's visitation and keeping her provider services in Ventura County, a fair, and perhaps more accurate reading of her petition—filed on the eve of the repeatedly continued Contested Hearing—was to derail Mother's effort to reunify with Minor, as the Agency and Mother argued. Minor used Jessica C.'s videos to show what she claimed was her dysregulation as a result of increased unsupervised visits with Mother, with

27

the hope of remaining in the care of her foster family and ultimately being adopted into that family.

Indeed, the evidence supports the finding of a coordinated effort by Minor, Jessica C., and L.B. to prevent Mother from reunifying with Minor by focusing on the bond between Minor and her foster family and the perception she was better off in their care. This included the notes from Minor's therapist that Jessica C. was seeking "medical documentation" to support a correlation between Minor's behavior and increased visits with Mother; the report from Minor's primary care physician expressing growing concern over Minor's behavior after visits with Mother; Minor's request at nearly every hearing to limit Mother's visitation and her (new) counsel's refusal to agree to a 60-day trial visit before the Contested Hearing, claiming that visit would violate Minor's due process rights; and Jessica C.'s repeated arguments that L.B. had standing to challenge the removal of Minor in a section 388 petition she helped him prepare, which sought termination of Mother's reunification services and permanent placement with de facto parents. For these reasons, among others, the juvenile court questioned the "veracity as well as the bias" of the foster parents in this case.[9]

Minor nonetheless argues that under *In re Jasmon O.* (1994) 8 Cal.4th 398 (*Jasmon O.*), the juvenile court erred in refusing to consider her relationship with her foster family and her best interest in remaining in their care. In *Jasmon O.*, the father sought return of his dependent child when her

---

[9]    We mean no disrespect, as there can be no doubt the foster parents love Minor, provided her a safe and loving home while under their care, and understandably were upset at the prospect of her returning to Mother's custody. But under our dependency law, the legislative goal at this last stage of reunification requires that a dependent child be returned to the custody of his or her parent or guardian unless doing so would be detrimental to the child's well-being. (§ 366.22, subd. (a)(1).)

case was in permanency planning years after her removal. (*Id.* at pp. 407–410.) The Supreme Court reversed the Court of Appeal's decision to vacate the order granting the petition of the social services agency to set aside the permanency planning order. (*Id.* at pp. 407–408.)

We conclude *Jasmon O.* is legally inapposite because it involved the stage of dependency when "reunifications efforts have ceased and the state's purpose is no longer reunification, but to free the child for adoption or other permanent, out of home placement," which is not this case. (*Jasmon O., supra*, 8 Cal.4th at p. 425.) *Jasmon O.* is also factually inapposite because unlike the no-detriment finding in the instant case, the juvenile court there found "detriment to the child and parental inadequacy warranted termination of the father's parental rights." (*Id.* at p. 407.)

In sum, we conclude the juvenile court did not violate Minor's due process rights, as the record shows the court considered Minor's evidence in support of her section 388 petition in making its no-detriment finding, including evidence that arguably was beyond what due process requires at this final stage of reunification. We also conclude Minor's petition became moot once the court ordered Minor's return to Mother's custody, to the extent Minor sought any other relief (i.e., termination of reunification services). (See *In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*) ["A court is tasked with the duty ' "to decide actual controversies by a judgment [or order] which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' "].)

## 2. L.B.'s Petition

Our discussion regarding Minor applies with the same force to L.B. and his petition. Unlike Minor, who ostensibly sought to limit overnights and

29

restrict Minor's services to her providers in Ventura County, L.B.'s petition sought to terminate Mother's reunification services and to permanently place Minor in his adoptive home. We conclude his requested relief, while certainly understandable given his sibling bond with Minor, could not deprive Mother of her right to services and ultimately, to reunite with Minor during this critically important final-review stage. (§ 366.22, subd. (a)(1); *Rita L., supra*, 128 Cal.App.4th at pp. 509–510; *Alvin R., supra*, 108 Cal.App.4th at p. 972; *Elizabeth R., supra*, 35 Cal.App.4th at p. 1797.)

L.B. nonetheless contends the juvenile court erred in trailing his petition behind the Contested Hearing, relying on section 388, subdivision (b)(1) for support. We are not persuaded.

Initially, we question whether L.B. had standing to participate in the Contested Hearing because he was not seeking "to *assert* a relationship as a sibling," as provided in subdivision (b)(1) of section 388. (Italics added; see footnote 5 *ante.*) Instead, as is clear from his petition and the fact Minor had lived in his adoptive home since being removed just days after her birth, a sibling relationship already existed when L.B. filed his petition.[10] (See *In re A.V.* (2017) 11 Cal.App.5th 697, 704–705 [well-accepted rules of statutory construction provide that significance should be afforded " 'to *every* word, phrase and sentence in pursuance of the legislative purpose' " to avoid " 'making some words surplusage' " (italics added)].)

Moreover, the legislative history shows the intent of the Legislature in enacting subdivision (b)(1) of section 388 was to ensure the juvenile court considered whether a dependent child had siblings in dependency and if so,

---

[10] We requested supplemental briefing from the parties regarding whether L.B. had standing under section 388, subdivision (b)(1) to participate in the Contested Hearing. We have considered that briefing in rendering our decision in this case.

"whether it would be appropriate to keep the siblings together" (Legis. Counsel's Dig., Assem. Bill No. 1987 (1999–2000 Reg. Sess.)); to require the juvenile court to assess "the nature of the relationship between the child and his or her siblings *under the court's jurisdiction* when the court reviews the status of a dependent child in foster care" (*ibid.*, italics added); and for a social worker to explain "why" "dependent children who are siblings are not placed together" (*ibid.*; see *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1401 [to ascertain the Legislature's intent, we may look to the Legislative Counsel's summary digests which, although not binding, "are entitled to great weight"]; see also *Becerra v. Superior Court* (2020) 44 Cal.App.5th 897, 920 [a court has discretion to "look to legislative history" even if a statute appears unambiguous]).

The legislative history suggests the Legislature did not intend section 388, subdivision (b)(1) to apply to a child like L.B. because he, unlike Minor, was not under the jurisdiction of the juvenile court when he filed his petition. It casts further doubt on whether L.B. had standing to participate in the Contested Hearing.

But, even if L.B. had standing, which we will assume for purposes of this case, we note the juvenile court allowed him to participate in the Contested Hearing, albeit in a limited way due to what we now conclude was his premature request for permanent placement of Minor in his adoptive home. But unlike Minor, L.B. did not offer any evidence in support of his petition. Given the relief sought by L.B. and the circumstances of this case, we conclude he received the process he was due, and the court did not err in trailing his section 388 petition and ultimately dismissing it as moot. (See *D.P., supra*, 14 Cal.5th at p. 276; *Jeanette V., supra*, 68 Cal.App.4th at p. 817 [no due process right to present irrelevant or marginally relevant evidence].)

31

## DISPOSITION

We affirm the juvenile court's September 17, 2024 order returning Minor to the physical custody of Mother and dismissing the section 388 petitions of Minor and L.B.[11]

IRION, J.

WE CONCUR:

O'ROURKE, Acting P. J.

KELETY, J.

---

[11] In light of our decision, we deem it unnecessary to address the Agency's alternate contentions including that Minor and L.B. forfeited their claims on appeal by allegedly failing to object to the juvenile court's decision regarding when it would hear their respective petitions.